[No. A057353. First Dist., Div. Two. Oct. 22, 1993.]

STEVE LADAS et al., Plaintiffs and Appellants, v.
CALIFORNIA STATE AUTOMOBILE ASSOCIATION et al., Defendants
and Respondents.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

**COUNSEL**

Charles E. C. Harris, Robert S. Boulter, Kennedy P. Richardson and Mark Palley for Plaintiffs and Appellants.

Thelen, Marrin, Johnson & Bridges, Ted W. Harris, Dean A. Morehous, Jr., and Mary L. Diepenbrock for Defendants and Repondents.

**OPINION**

**SMITH, J.**—Three insurance sales representatives employed by defendant California State Automobile Association (CSAA) appeal from a judgment

dismissing their breach-of-contract complaint against their employer, and from a postjudgment order denying their motion to tax costs. The judgment followed a ruling by the trial court excluding all evidence of CSAA's alleged promises to compensate appellants on a par with "industry standards" and to provide them with adequate "logistical support."

For reasons other than those relied on by the trial court, we find that the motion *in limine* was properly granted and will affirm the judgment. We also conclude that the court erred in refusing to tax costs and will reverse that order.

## BACKGROUND

Plaintiffs-appellants Steve Ladas, George Demiris, and Eugene Choppelas are employed as insurance sales representatives for CSAA. When they were hired in the 1960's, each of the appellants signed a two-page "Solicitor's Appointment Agreement" (solicitor's agreement). The agreement promises to pay appellants commissions for new and renewal business "in accordance with the Sales Representative Compensation Plan" (comp plan) promulgated by CSAA, which *"reserves the right to make such changes in commission rates and in the aforementioned Compensation Plan as may from time to time be deemed advisable."*

Initially, CSAA paid its sales representatives commissions on a straight percentage-of-premiums basis. In 1961 the company converted to a more complicated "unit value" system, which has been in place continuously since then. Under the unit value system, various auto and homeowner policies are assigned a number of units. The total number of units is then multiplied by an assigned unit value (a dollar amount) to yield the commission earned on that policy. The unit value system, along with tables for computing commissions, was set forth in the comp plan, which CSAA revised from time to time over the years. Under the heading "Compensation" the more recent comp plans stated: "The compensation program set forth herein is all inclusive and no additional compensation will normally be granted for automobile use or other business expenses."

The comp plan was revised on several occasions during appellants' employment. From 1961 to 1986, CSAA raised the unit value ratio several times. During this time, according to appellants, their level of compensation kept pace with those of sales representatives working for other insurance companies. Beginning in 1987, however, appellants assert that comp plan rates failed to maintain their commission income at levels comparable to the rest of the industry. At the same time, they claim, CSAA stopped providing

them with adequate "logistical support," described as including such things as telephone systems, administrative, clerical and secretarial assistance, and office space.

On August 23, 1989, appellants filed this action for breach of contract. Among other things, the complaint alleges that CSAA breached appellants' employment contract, which was "partially oral and partially written," by failing to fulfill its contractual obligations to (1) compensate them in parity with other similarly situated insurance sales agents in the industry, and (2) provide them with adequate logistical support and working conditions.

Prior to trial, CSAA moved for summary judgment and obtained an order partially adjudicating issues in its favor. By the time of trial, appellants' action was pared down to the two breach of contract claims noted above and a cause of action for wrongful termination.

Before empanelment of the jury CSAA moved to exclude, on the basis of the parol evidence rule, all evidence offered by appellants to prove their breach of contract claims. The court agreed to conduct a full evidentiary hearing on the motion.

After a three-day hearing at which witnesses were called and evidence submitted, the court concluded that appellant's employment contract, consisting of the solicitor's agreement and the 1986 comp plan, was an integrated agreement and that the extrinsic evidence offered by appellants was not admissible to prove their parity claim. The court also barred evidence of appellants' claim for inadequate logistical support on the ground that it had been adjudicated adversely to them in the summary adjudication order. Finally the court ruled that appellants' wrongful termination claim was nonjusticiable because that they were still employed by CSAA.[1] The court issued an order granting the motion *in limine* and entered judgment in favor of CSAA. This appeal follows.

APPEAL

I

*Parity Claim*

Appellants' central claim is that, beginning in 1987, CSAA breached an alleged contractual obligation requiring it to compensate them at levels

---

[1] Appellants do not here challenge the propriety of the court's dismissal of the wrongful termination count.

"comparable" to what sales agents were earning at other insurance companies. In the words of the complaint, CSAA promised that it would "pay plaintiffs at the same level as other similarly situated insurance sales representatives so that plaintiffs can *maintain a compensation parity in keeping with industry standards*." (Italics added.)

At the *in limine* hearing appellants did not dispute that neither the solicitor's agreement nor any of the compensation plans promulgated by CSAA refers to "parity," "industry standards" or similar terms. Instead, they contended that such promises were contained in various oral and written material issued by CSAA during their employment tenure, and therefore should be deemed part of the contract.

## Extrinsic Evidence

Because of CSAA's motion to exclude all evidence of any promise to pay "parity" under the parol evidence rule, all of the evidence which appellants claimed supported such a promise was produced at the *in limine* hearing. They offered four kinds of evidence:

### 1. *Employee Handbooks.*

Employee handbooks during the period 1961 to 1968 included the statement "It is our aim to keep salaries equal to or higher than average salary rates for comparable work in each locality." From 1968 to 1984 the handbook stated under EMPLOYEE POLICIES: "It is the policy of the Association to: . . . 2. Provide employment at a wage which compares favorably with prevailing community rates for similar work under comparable conditions requiring like responsibility, experience, effort and skill." Beginning in 1985, CSAA eliminated all references to comparable wages or prevailing rates. Moreover, the 1986 handbook, which was in effect at the inception of the alleged breach of contract, contains an announcement in small print that "All previous editions are obsolete."

### 2. *Pay Increase Announcements.*

In 1977, 1978, and 1979, CSAA issued announcements of pay increases which referred to the company's "program" or "practice" of periodically adjusting schedules to maintain salaries or salary ranges commensurate with comparable types of organizations.

### 3. *Internal CSAA Memoranda.*

In the 1960's and 1970's, CSAA management met with sales agent representatives and often circulated the minutes of such meetings. In the

minutes of the August 7, 1969, meeting a company official states that it is CSAA's "practice" to periodically review the salary and income structure of all employees and make adjustments when justified by studies of income levels at comparable industries. In the minutes of a September 3, 1970, meeting a management representative explained that it was the company's "objective" that adjusters and clerical staff earn "as much if not more than adjusters employed by our competitors."

### 4. Oral Statements.

Appellants Ladas and Choppelas testified that during their careers, their supervisors told them from time to time that they were getting paid as much as agents from State Farm, Allstate, and Farmers for similar work.

### DISCUSSION

The trial court ruled all of the foregoing evidence inadmissible on the ground that appellants' written employment contract, which consisted of the solicitor's agreement and the 1986 comp plan, was integrated and not susceptible of an interpretation that CSAA sales representatives were to be compensated "at parity," according to "industry standards" or by any method other than that set forth in the comp plan.

Appellants attack this ruling on several grounds. They argue that the comp plan and solicitor's agreement are not integrated documents, nor the sole evidence of their contract. They contend that the sentence in the solicitor's agreement granting CSAA the right to change commission rates "as may from time to time be deemed advisable" is ambiguous and amenable to a construction that CSAA would consider factors such as wage parity and cost of living when making adjustments to the comp plan. Finally, they urge that their evidence could be considered as a subsequent *modification* of the employment contract, and thus not subject to application of the parol evidence rule at all.

The fact that the trial court based its decision on the parol evidence rule does not restrict our inquiry. ■ We review the judgment, not the reasoning of the court below. (*United Pacific Ins. Co.* v. *Hanover Ins. Co.* (1990) 217 Cal.App.3d 925, 933 [266 Cal.Rptr. 231].) "There is perhaps no rule of review more firmly established than the principle that a ruling or decision correct in law will not be disturbed on appeal merely because it was given for the wrong reason. If correct upon any theory of law applicable to the case, the judgment will be sustained regardless of the considerations that moved the lower court to its conclusion. [Citations.]" (*Belair* v. *Riverside*

*County Flood Control Dist.* (1988) 47 Cal.3d 550, 568 [253 Cal.Rptr. 693, 764 P.2d 1070].)

■ Without deciding the correctness of court's interpretation of the parol evidence rule, we uphold its order granting CSAA's motion *in limine* for what appears to us to be a clearer, more fundamental reason—the alleged promise by CSAA to "consider" parity in setting commission rates based on the evidence submitted by appellants is too vague and indefinite to give rise to an enforceable contractual duty.[2]

■ Under basic contract law "[a]n offer must be sufficiently definite, or must call for such definite terms in the acceptance that the performance promised is reasonably certain." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 145, p. 169, citing Rest.2d Contracts, § 33; see also *Mutz* v. *Wallace* (1963) 214 Cal.App.2d 100, 109 [29 Cal.Rptr. 170], *Richards* v. *Oliver* (1958) 162 Cal.App.2d 548, 561 [328 P.2d 544].) "Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable. [Citation.]" (*Cal. Lettuce Growers* v. *Union Sugar Co.* (1955) 45 Cal.2d 474, 481 [289 P.2d 785, 49 A.L.R.2d 496]; see Civ. Code, § 1598.)

To be enforceable, a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages. (*Robinson & Wilson, Inc.* v. *Stone* (1973) 35 Cal.App.3d 396, 407 [110 Cal.Rptr. 675]; *Richards* v. *Oliver, supra,* 162 Cal.App.2d 548, 561; *Ellis* v. *Klaff* (1950) 96 Cal.App.2d 471, 478 [216 P.2d 15].)

■ The vague nature of the alleged duty to pay parity is best illustrated by appellants' counsel's comments at the *in limine* hearing: "The plaintiffs concede that the contract as written does not—does not expressly state that the agents will be paid exactly what State Farm, Farmers or Allstate agents receive as commissions. Plaintiffs are not asking for that. [¶] We have all along merely been proposing this evidence solely so that it could be offered as *one of the factors* that the company would *consider* when it adjusted the unit value . . . . [¶] . . . I am merely asking that [commission rates paid by other insurers] *be taken into consideration* by the company or that there was an *obligation or a promise* . . . a company policy and practice that they would take that into consideration." (Italics added.)

---

[2]Whether a contract term is sufficiently definite to be enforceable is a question of law for the court. (*Ersa Grae Corp.* v. *Fluor Corp.* (1991) 1 Cal.App.4th 613, 623 [2 Cal.Rptr.2d 288].) Moreover, the issue of vagueness is properly before us. CSAA argued both here and in the trial court that the alleged promise was of a noncontractual nature and not sufficiently definite to give rise to a contractual obligation.

An amorphous promise to "consider" what employees at other companies are earning cannot rise to the level of a contractual duty. Appellants were paid according to a precise unit value system detailed in the comp plan. By what standard would a court or a jury determine that the company failed to meet its obligation to "consider" commissions earned by competitors? What would be the relevant market on which such a duty would be predicated? CSAA's four major competitors? All insurers in the state? Eighty companies nationwide? How would "damages" be calculated? By totalling up all yearly commissions earned by other agents, averaging them and subtracting the difference? By coming up with an "industry standard" factor and increasing CSAA's unit value ratio by that factor? The nature of the obligation asserted provides no rational method for determining breach or computing damages.

Cases from outside California confirm that promises by an employer to pay "parity" or "according to industry standards" are not sufficiently definite to be enforceable. In *Ellis* v. *El Paso Natural Gas Co.* (10th Cir. 1985) 754 F.2d 884, the court held unenforceable as a contractual duty a provision in an employer's personnel manual that " 'The company will maintain a balanced compensation program applicable to all employees clearly relating to the skill, responsibility, experience and knowledge requirements of each position . . . and *competitive pay rates and salary ranges within the industry and operational area for comparable work.*' " (Italics added.) The court agreed with the lower court's finding that such language was " 'too indefinite to constitute a contract. There is a total lack of specific contractual terms which might evidence the intent to form a contract.' " (*Id.*, at p. 886.)[3] In *Engstrom* v. *John Nuveen & Co., Inc.* (E.D.Pa. 1987) 668 F.Supp. 953, the court found a promise of " 'excellent treatment in salaries, bonuses and promotions' " and to " 'make up' " for lost stock investments unenforceable due to vagueness. (*Id.*, at pp. 961-962.) Finally, in *Broderick* v. *Catholic University of America* (D.D.C. 1973) 365 F.Supp. 147 (affd. 530 F.2d 1035 [174 App.D.C. 183]), the court held that statements by university administrators that the university's goal was to achieve "parity" in compensation levels between clerical and lay faculty members "as soon as possible" was

---

[3]Appellants' claim that *Ellis* has been "overruled" by the New Mexico Supreme Court in *Lukoski* v. *Sandia Indian Management Co.* (1988) 186 N.M. 664 [748 P.2d 507] (*Lukoski*), is meritless. *Lukoski* involved an *oral* contract of employment in which the employer promulgated an employee handbook containing specific procedures regarding discipline, suspension and termination of company employees. The handbook was signed by the employee and kept in his personnel file.

The *Lukoski* court rejected the employer's reliance on *Ellis* for the proposition that the language in the handbook was too vague. Without in any way disapproving *Ellis*, the court held simply that "from the language of the handbook and the conduct of [the employer] in adopting the policy, it could be properly found that the policy was part of the employment agreement." (*Lukoski*, *supra*, 748 P.2d at p. 509.)

too "amorphous" and "precatory" to form the basis for a promissory estoppel claim. (365 F.Supp. at pp. 150-152.)[4]

Policy reasons also support our conclusion that the alleged promise is unenforceable. This is not a situation comparable to *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373], where oral statements and policy manuals assuring that an employee will not be terminated without just cause may justify the imposition of an implied-in-fact term to that effect in the employment agreement. (*Id.*, at pp. 676-679.) Employers frequently boast of good benefits, competitive salaries, excellent working conditions and the like. To anoint such puffing language with contractual import would open the door to a plethora of specious litigation and constitute a severe and unwarranted intrusion on the ability of business enterprises to manage internal affairs.

Such policy considerations moved the Michigan Supreme Court in *Dumas* v. *Auto Club Ins. Assn.* (1991) 437 Mich. 521 [473 N.W.2d 652] (*Dumas*) to reject a suit by insurance agents claiming that an implied-in-fact term of their contracts was that their commission rates would not decrease during their employment.

Previously, the court had held that a covenant precluding termination without good cause could be implied into an employment contract if justified by the employee's "legitimate expectations grounded in an employer's policy statements." (*Toussaint* v. *Blue Cross & Blue Shield of Mich.* (1980) 408 Mich. 579 [292 N.W.2d 880, 885].)

In *Dumas*, however, the court declined to extend that doctrine to the area of employee compensation. "Were we to extend the legitimate-expectations claim to every area governed by company policy, then each time a policy change took place contract rights would be called into question. The fear of courting litigation would result in a substantial impairment of a company's operations and its ability to formulate policy. . . . [¶] . . . Given the traditional reluctance of courts to interfere with management decisions and the needed flexibility of businesses to change their policies to respond to changing economic circumstances, we conclude that *Toussaint* should not be extended to create legitimate expectations of a permanent compensation plan." (473 N.W.2d at pp. 656-657.)

---

[4]Although they did not specifically cast their claim for relief in promissory estoppel terms, a central theme of appellants' position, both here and in the trial court, was that they detrimentally relied on CSAA's policy concerning industry parity and would have left the company years ago had they known that CSAA was going to abandon it.

*Dumas*'s analysis is applicable here. Companies, like people, change direction. Accepting at face value appellants' premise that CSAA formerly used surveys of market rates as a factor in fixing its commission rate and that this policy was abandoned in 1986, we see no reason why an employer should not be free to alter methods of compensating employees when circumstances so dictate and the alteration does not violate any clear contractual restraint.

It was conceded below that CSAA ceased all statements concerning "parity" or "industry standards" after 1985. Yet appellants seek to impose contractual liability on CSAA for such statements beginning in 1987, two years *after* the cessation of the alleged parity policy. We have no difficulty concluding that contractual duties may not be predicated on employer practices or policies which have become obsolete.[5]

## II

### *Logistical Support**

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### *Motion to Tax Costs*

Pursuant to Code of Civil Procedure section 1033.5 (section 1033.5) CSAA filed a cost bill in which it claimed $22,981.13 in costs "as a matter of right" (*id.*, subd. (a)) and $18,124.15 in "discretionary" costs (*id.*, subd. (c)(4)), for a total of $41,105.28.

Appellants filed a motion to tax costs, challenging the propriety of a number of items. The trial court denied the motion in a one-sentence minute order. Appellants appeal from the order denying their motion, claiming that a number of items were improperly allowed.

"[S]ection 1033.5, enacted in 1986, codified existing case law and set forth the items of costs which may or may not be recoverable in a civil

---

[5]As indicated previously (p. 769, *ante*), appellants have tried to avoid the effect of the parol evidence rule by claiming that CSAA's promise to pay parity could be construed as a *subsequent modification* of their employment agreement. CSAA vigorously disputes this notion and urges that appellants are foreclosed from raising this theory for the first time on appeal. Our conclusion that the promise is unenforceable moots this debate.
  *See footnote, *ante*, page 761.

action. [Citation.]" (*Van de Kamp* v. *Gumbiner* (1990) 221 Cal.App.3d 1260, 1291 [270 Cal.Rptr. 907].) An item not specifically allowable under subdivision (a) nor prohibited under subdivision (b) may nevertheless be recoverable in the discretion of the court if "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation." (§ 1033.5, subd. (c)(2).)

■ If the items appearing in a cost bill appear to be proper charges, the burden is on the party seeking to tax costs to show that they were not reasonable or necessary. On the other hand, if the items are properly objected to, they are put in issue and the burden of proof is on the party claiming them as costs. (*Melnyk* v. *Robledo* (1976) 64 Cal.App.3d 618, 624 [134 Cal.Rptr. 602]; *Oak Grove School Dist.* v. *City Title Ins. Co.* (1963) 217 Cal.App.2d 678, 698-699 [32 Cal.Rptr. 288].) Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion. (*Lubetzky* v. *Friedman* (1991) 228 Cal.App.3d 35, 39 [278 Cal.Rptr. 706].) However, because the right to costs is governed strictly by statute (*Hogan* v. *Ingold* (1952) 38 Cal.2d 802, 814 [243 P.2d 1, 32 A.L.R.2d 834]) a court has no discretion to award costs not statutorily authorized. (See *Rose* v. *Hertz Corp.* (1985) 168 Cal.App.3d Supp. 6, 11 [214 Cal.Rptr. 795]; *Parker* v. *City of Los Angeles* (1974) 44 Cal.App.3d 556, 566 [118 Cal.Rptr. 687]; *Strickland* v. *Becks* (1979) 95 Cal.App.3d Supp. 18, 20 [157 Cal.Rptr. 656].)

We apply the foregoing principles to the various items challenged by appellants.

1. *Attorney Lunches*

■ Included among CSAA's schedule of "Deposition Related Travel Expenses" were more than $1,000 for lunches consumed while attending *local* depositions and other meals simply designated "Business Meal Expenses (Not Deposition Related)." Appellants' contention that these expenses were not recoverable as costs is meritorious.

The only meal expenses statutorily allowable are those for jurors while they are kept together during trial and deliberation. (§ 1033.5, subd. (a)(2).) While section 1033.5, subdivision (a)(3) allows the cost of *taking* and *transcribing* depositions and "travel expenses to attend depositions," it does not mention meals eaten while attending local depositions. Nor can meal expenses be justified as "necessary to the conduct of the litigation" since attorneys have to eat, whether they are conducting litigation or not. At best,

these expenses are "merely convenient or beneficial" to preparation for litigation, the recovery of which is proscribed under section 1033.5, subdivision (c). They should have been stricken.

2. *Trial Exhibits, Binders and Tabs*

■ CSAA claimed $10,202.89 for trial exhibits, blowups and transparencies, and an additional $1,167.58 for binding and tabbing the exhibits. Section 1033.5, subdivision (a)(12) provides that expenses of trial exhibits "may be allowed *if they were reasonably helpful to aid the trier of fact."* (Italics added.) It follows that fees are not authorized for exhibits not used at trial. Since the case was dismissed before trial, CSAA failed to qualify for recovery of exhibit costs under this standard. These items should have been disallowed in their entirety.

3. *Faxes*

■ CSAA included in the cost bill $4,147 for faxed documents from 1989-1992. Section 1033.5, subdivision (b)(3) forbids reimbursement of expenses for postage, telephone and photocopying. While the statute, written seven years ago, makes no reference to fax charges, we believe they are embraced within this prohibition. Fax expenses contain elements of all three of the above nonrecoverable items, and it is unlikely that the Legislature intended to allow attorneys to circumvent the statutory bar by using a fax machine instead of the mail, the telephone or a photocopier.[6]

4. *Local Travel Expenses*

■ Another item disputed by appellants was $1,680.21 for "Local Travel Expenses" unrelated to depositions. These items included parking fees, cab fares and "mileage/parking" fees for attorneys and paralegals, during 1989-1992.

The only travel expenses authorized by section 1033.5 are those to attend depositions. (§ 1033.5, subd. (a)(3).) Routine expenses for local travel by

---

[6]CSAA's citation to *Levy v. Toyota Motor Sales, U.S.A., Inc.* (1992) 4 Cal.App.4th 807 [5 Cal.Rptr.2d 770], as sweeping justification for these and similar expenses is not well taken. In *Levy,* respondents moved to tax costs of $2,106.41 for "word processing and secretarial work, photocopying, travel and parking, expert inspections, telefaxes and messenger service." (*Id.,* at p. 816.) The trial court reduced the award to $1,000 without indicating how it arrived at its determination. Without a record specifying which costs were allowed or disallowed, the Court of Appeal simply presumed that the reduction was a proper exercise of the court's discretion. (*Id.,* at p. 817.) *Levy* thus does not stand for the proposition that any specific item is or is not recoverable.

attorneys or other firm employees are not reasonably necessary to the conduct of litigation. The declaration of CSAA Attorney Joseph Hunsader failed to demonstrate how any of these charges were necessary to conduct the litigation, as opposed to being merely convenient. The expenses should not have been allowed.

### 5. *Delivery Charges*

■ Appellants characterize as "excessive" $2,518.91 claimed by CSAA for courier and messenger charges. However, the declaration of Hunsader stated that these charges were related to trial preparation, and were incurred for such matters as filing documents with the court, complying with appellants' document demands, and transporting exhibits to and from the courtroom. The declaration provides substantial evidence that these charges were reasonably necessary. The trial court therefore had an adequate basis for allowing these costs under section 1033.5, subdivision (c)(4), and its denial of the motion in this respect was not an abuse of discretion.

### 6. *Computer Legal Research*

■ The court allowed CSAA's claim of $5,697.40 for "Computer Legal Research." This was error. Section 1033.5, subdivision (b)(2) precludes recovery of investigation expenses and attorney fees are not compensable as costs in the absence of an agreement of the parties or statutory authority. (Code Civ. Proc., § 1021.) Fees for legal research, computer or otherwise, may not be recovered under section 1033.5.

### 7. *Department of Insurance Fees*

■ CSAA listed $2,044 for Department of Insurance fees. Hunsader's declaration explains that these fees were paid for obtaining documents from the Department of Insurance. They contained data relevant to appellants' parity claim and were utilized by a CSAA expert in preparing to testify on that subject.

The court should have stricken this item. A party may not recover fees for experts not ordered by the court (§ 1033.5, subd. (b)(1)), and subdivision (b)(2) of section 1033.5 plainly bars recovery of "[i]nvestigation expenses in preparing the case for trial." An award of fees incurred in order to assist an expert prepare his testimony runs contrary to either or both of the foregoing subdivisions.

## DISPOSITION

The judgment is affirmed. The cause is remanded to the trial court to vacate its order denying appellants' motion to tax costs and enter a new order taxing costs in accordance with the views expressed herein. Each party to bear its own costs on appeal.

Kline, P. J., and Benson, J., concurred.

A petition for a rehearing was denied November 19, 1993.