107 F.3d 877
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Michael G. FAVREAU, Plaintiff-Appellant,
v.
CHEMCENTRAL CORPORATION; Roe Corporation, Defendants-Appellees.
 No. 94-56707.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 6, 1996.
Decided Feb. 27, 1997.
 
 1
 Before: REINHARDT, KOZINSKI and HAWKINS, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 
 3
 Plaintiff-appellant Michael G. Favreau brought three state causes of action against his former employer, defendant-appellee Chemcentral Corporation, in California state court. Favreau's first claim was that Chemcentral breached an implied-in-fact contract not to terminate Favreau without good cause. The second claim alleged Chemcentral breached an implied covenant of good faith and fair dealing. Favreau's third claim was for discriminatory discharge in violation of the California Fair Employment and Housing Act ("FEHA"), and alleged that Chemcentral fired him, at least in part, because his wife is black. After the suit was removed to federal court on the basis of diversity, the district court granted Chemcentral's motion for summary judgment as to all three claims. Favreau appeals that summary judgment order with respect to all three claims.
 
 
 4
 We have jurisdiction under 28 U.S.C. § 1291, and we reverse.
 
 
 5
 A. The claim for breach of an implied-in-fact contract
 
 
 6
 California law presumes that an employment relationship is at will. California Labor Code § 2922 provides that "[a]n employment, having no specified term, may be terminated at the will of either party on notice to the other." This presumption may be overcome, however, by "a contract, express or implied, limiting the employer's right to discharge the employee." Foley v. Interactive Data Corp., 765 P.2d 373, 376 (Cal.1988) (citations omitted). Absent such a contract, however, "the employee can be fired with or without good cause," subject to public policy limitations not at issue here. Id.
 
 
 7
 To state a claim for breach of a contract limiting an employer's right to terminate at will, a claimant must establish that such a contract existed. Because Favreau concedes the absence of an express contract, he must establish the existence of an implied-in-fact contract. Several factors are relevant to determining whether an implied-in-fact contract existed to prevent Chemcentral from terminating Favreau without good cause. These factors include: (1) the personnel policies or practices of the employer, (2) the employee's longevity of service, (3) actions or communications by the employer reflecting assurances of continued employment, and (4) practices of the industry in which the employee is engaged. Id. at 387 (citing Pugh v. See's Candies, 171 Cal.Rptr. 917, 925 (Cal.Ct.App.1981)).
 
 1. Personnel policies
 
 8
 One basis for inferring an agreement or promise to limit the grounds for termination is an "employee's reasonable reliance on the company's personnel manual or policies." Foley, 765 P.2d at 388. Favreau urges that Foley's "reasonable reliance" standard does not require that a plaintiff actually rely on the policies, and insists that the mere existence of such policies creates an implied-in-fact contract, whether or not the employee ever knew of their existence.
 
 
 9
 We disagree with Favreau's reading of Foley. Although Foley does not specify whether "the employee's reasonable reliance" embodies a requirement that the employee actually knew of the policies, subsequent California cases suggest that the employee's actual reliance is necessary. In Scott v. Pacific Gas & Electric Co., 904 P.2d 834 (Cal.1995), the Supreme Court of California explained:
 
 
 10
 [T]here is no rational reason why an employer's policy that its employees will not be demoted except for good cause ... cannot become an implied term of an employment contract. In [such] instances, an employer promises to confer a significant benefit on the employee, and it is a question of fact whether that promise was reasonably understood by the employee to create a contractual obligation.
 
 
 11
 Scott, 904 P.2d at 839 (emphasis added).
 
 
 12
 In framing the inquiry as "whether [the] promise was reasonably understood by the employee," Scott implicitly poses two questions: whether the employee actually understood the promise to create a contractual obligation and whether that understanding was reasonable.
 
 
 13
 Favreau insists that Foley recognizes an employee's reliance on an employer's policies whether or not the employee knew the policies existed. For this proposition, he invokes Foley's citation to Toussaint v. Blue Cross & Blue Shield of Michigan, 292 N.W.2d 880 (1980).[1] Favreau's reliance on Toussaint is problematic for several reasons. First, and most obviously, this passage is not actually quoted in Foley, and comes from a Michigan case and thus is not binding authority. Second, the passage does not make clear what type of reliance is required. Although it states that the employee need not know "the particulars of the policies," those words could be interpreted to suggest that a detailed understanding of the policies is not required, merely a general awareness of the policies. Other language suggests that the employee must at least be aware of the existence of such policies: The employer must "make [the policies] known its employees" and the work environment must be one in which "the employee believes" in the fairness and consistency of the policies. Id.
 
 
 14
 More importantly, subsequent Michigan cases read Toussaint to require that the employee actually know of the policies. See Riethmiller v. Blue Cross and Blue Shield of Michigan, 390 N.W.2d 227, 231 (Mich.App.1986) (emphasis added) (implied-in-fact contract may be found where employer makes a statement "which tends to create legitimate expectations in the employees' minds that they will be discharged only for just cause"); and Dumas v. Auto Club Ins. Ass'n, 473 N.W.2d 652, 655 (Mich.1991) (emphasis added) (explaining that Toussaint held that "written policy statements providing for dismissal for just cause may create contractual obligations if the statements give rise in the employee to legitimate expectations of dismissal for just cause.").
 
 
 15
 Having concluded that an employee alleging an implied-in-fact contract must establish actual reliance to prevail, we next note that there was conflicting evidence below as to whether Favreau actually relied on Chemcentral's personnel policies as a promise not to fire him without good cause.
 
 
 16
 Several pieces of evidence suggested that Favreau did not actually rely on Chemcentral's personnel policies as a promise not to fire him absent good cause. First, Favreau admitted that he completed an employment application at the time Chemcentral hired him as a sales trainee in May 1990. Although neither party produced a copy of Favreau's employment application, Chemcentral produced its standard employment application, which provides:
 
 
 17
 [A]ny employment relationship with [Chemcentral] is of an 'at will' nature, which means that the Employee may resign at any time and the Employer may discharge Employee at any time with or without cause. It is further understood that this 'at will' employment relationship may not be changed by any written document or by conduct unless such change is specifically acknowledged in writing by an authorized executive of [Chemcentral].
 
 
 18
 Second, Favreau made several admissions in his January 31, 1994 deposition which suggest that he relied on neither explicit nor implicit promises not to terminate him absent good cause. He admitted that he never saw "any documents ... that explicitly contained any language promising that employees could not be terminated without good cause," and admitted that he never saw "any documents which had language from which [he] inferred that employees could not be terminated without good cause." He also admitted that he never saw "any type of employee handbook or personnel manual," and that no Chemcentral manager or supervisor ever told him that employees were terminable only for cause.
 
 
 19
 Favreau did, however, receive a copy of Chemcentral's Code of Employee Conduct while employed at Chemcentral, which provided:
 
 
 20
 It is the goal of CHEMCENTRAL to follow the precepts of progressive discipline whenever practicable. CHEMCENTRAL will not impose disciplinary discharge or suspension on employees in an arbitrary manner, and will issue verbal and written reprimands where appropriate.
 
 
 21
 The Code thereafter lists and describes various disciplinary measures deemed appropriate for various forms of employee misconduct. It contains a section entitled "Causes for Discharge," which enumerates "infractions [that] are of such a nature or severity that discharge is the only appropriate action to be taken."
 
 
 22
 On September 9, 1994, several months after his deposition, Favreau executed a declaration in which he stated that he received the Code of Employee Conduct and that he "understood from the contents of such document that [Chemcentral] would not terminate my employment in an arbitrary manner, but only for good cause." This assertion in Favreau's declaration is plainly inconsistent with the admissions in his deposition that he never saw "any documents ... that explicitly contained any language promising that employees could not be terminated without good cause," and that he never saw "any documents which had language from which [he] inferred that employees could not be terminated without good cause."
 
 
 23
 Chemcentral urges that Favreau's declaration cannot create an issue of fact "because it is in direct contradiction with Favreau's prior, sworn deposition testimony," and thus must be disregarded as a "sham" affidavit.
 
 
 24
 The general rule in this Circuit is that "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir.1991) (citing Foster v. Arcata Associates, Inc., 772 F.2d 1453, 1462 (9th Cir.1985); and Radobenko v. Automated Equipment Corp., 520 F.2d 540, 543-44 (9th Cir.1975)). The rationale for this principle is simple: "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." Kennedy, 952 F.2d at 266 (citations omitted).
 
 
 25
 This rule does not, however, automatically dispose of every case involving a contradictory affidavit. It is limited to " 'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment," id. at 266-67, and does not preclude a contradictory affidavit that "is introduced to explain portions of earlier deposition testimony." Id. Contradictory testimony is not a "sham" where it is "the result of an honest discrepancy, a mistake, or the result of newly discovered evidence." Id. at 267. We therefore require district courts to make "a factual determination that the contradiction was actually a 'sham.' " Id.
 
 
 26
 In this case, the district court made no such finding. Instead, it simply asserted that "Favreau did not rely on the Code" and "[did] not prove[ ] the existence of an employment contract based on said Code." It thus rejected, without explanation, Favreau's declaration that he had relied on the Code in concluding Chemcentral would not terminate him without good cause. Accordingly, we must remand this case so that the district court may make the necessary factual determination whether Favreau's later declaration was a mere "sham" affidavit "that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment." Id. at 266-67.
 
 
 27
 In our view, Favreau's declaration that he relied on the Code is the sole piece of evidence which--if it is not a "sham" affidavit--could create a triable issue of fact as to whether there existed an implied-in-fact contract. Although the Code was not dubbed a personnel manual, it was distributed to employees and was in force during Favreau's employment. Favreau could have reasonably relied on the Code's statement that it would not "impose disciplinary discharge ... in an arbitrary manner" as articulating a "for cause only" discharge policy. If the district court on remand finds that Favreau's declaration is a mere "sham" affidavit, then it may disregard that declaration and rule anew on summary judgment. If, however, it finds that the declaration is not a "sham," then summary judgment would be inappropriate and the district court shall continue with further proceedings on this claim.
 
 
 28
 2. Actions or communications by the employer reflecting assurance of continued employment
 
 
 29
 Favreau alleges that manager Don Fogarty told him that he might be a prospect for future promotion to a management position. Recent decisions of California courts suggest that such statements are mere "puffing language" and do not support a finding of an implied-in-fact contract not to terminate absent good cause. Ladas v. California State Automobile Ass'n, 23 Cal.Rptr.2d 810, 815 (Cal.Ct.App.1993) (rejecting plaintiffs' contention that their employer's promises of future raises rose to the level of contractual duty). The rationale of such decisions is that such statements do not articulate terms sufficiently definite to enforce, id. at 815, and enforcing such promises would be against public policy, since "[e]mployers frequently boast of good benefits, competitive salaries, excellent working conditions and the like. To anoint such puffing language with contractual import would open the door to a plethora of specious litigation and constitute a severe and unwarranted intrusion on the ability of business enterprises to manage internal affairs." Id. at 816.
 
 
 30
 3. Other factors: longevity of service and industry practices
 
 
 31
 Favreau's three-year tenure of employment at Chemcentral does not create a triable issue of fact as to the existence of an implied-in-fact contract. California courts have held a three-and-one-half year period of employment insufficient evidence of an implied-in-fact contract. Shapiro v. Wells Fargo Realty Advisors, 199 Cal.Rptr. 613, 619 (Cal.Ct.App.1984). Finally, Favreau offered no evidence as to the relevant industry practices.
 
 
 32
 B. The claim for breach of an implied covenant of good faith and fair dealing
 
 
 33
 Under California law, a claimant suing for breach of an implied covenant of good faith and fair dealing must establish the existence of an agreement to terminate for good cause only. Schneider v. TRW, Inc., 938 F.2d 986, 991 (9th Cir.1991); see also Foley, 765 P.2d at 394. Because the district court concluded that Favreau failed to offer evidence supporting such an implied-in-fact contract, it granted summary judgment for Chemcentral as to Favreau's claim for breach of an implied covenant of good faith and fair dealing.
 
 
 34
 Because we concluded above that Favreau's declaration asserting his reliance on the Code of Employee Conduct--if not a "sham" affidavit--would create a triable issue of fact as to the existence of an implied-in-fact contract not to terminate without good cause, we remand his claim for breach of an implied covenant of good faith and fair dealing, pending the district court's factual finding as to whether the declaration was a mere "sham." If the district court on remand finds that Favreau's declaration is a mere "sham" affidavit, then it may disregard that declaration and rule anew on summary judgment. If, however, it finds that the declaration is not a "sham," then summary judgment would be inappropriate and the district court shall continue with further proceedings on this claim.
 
 
 35
 C. The claim for discriminatory discharge under the California Fair Employment and Housing Act
 
 
 36
 Favreau's third claim, brought pursuant to the California Fair Employment and Housing Act ("FEHA"), Cal.Gov't Code § 12900 et seq., alleges that Chemcentral fired him, at least in part, because his wife is black. FEHA makes it "unlawful for an employer to discharge a person on the basis of race, or otherwise 'to discriminate against the person in compensation or in terms, conditions or privileges of employment.' " Mixon v. Fair Employment and Housing Comm'n, 237 Cal.Rptr. 884, 890 (Cal.Ct.App.1987). An employment discrimination claim may be based on an individual's marriage to someone of a protected class. Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888 (11th Cir.1986). Accord Chacon v. Ochs, 780 F.Supp. 680, 681 (C.D.Cal.1991) (Title VII discrimination claim may be based on "an individual's association with people of a different national origin.").[2]
 
 
 37
 To prevail on a theory of disparate treatment under FEHA, a claimant must establish that the employer acted with discriminatory intent. Where "discharge from employment is the challenged action, the complainant must make an initial showing that he was discharged from a position for which he was qualified 'under circumstances which give rise to an inference of unlawful discrimination.' " Mixon, 237 Cal.Rptr. at 891 (citing Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248 (1981)).[3] Although the claimant "need not prove that racial animus was the sole motivation behind the challenged action," he must nonetheless prove by a preponderance of the evidence that "there was a 'causal connection' between the employee's protected status and the adverse employment decision." Mixon, 237 Cal.Rptr. at 892.
 
 
 38
 A prerequisite to establishing discriminatory intent is establishing that the defendant knew of the claimant's race when he took the allegedly discriminatory action. Robinson v. Adams, 847 F.2d 1315 (9th Cir.1987) ("[a]n employer cannot intentionally discriminate ... based on race unless the employer knows the applicant's race."), cert. denied, 490 U.S. 1105 (1989). A plaintiff cannot create an inference of racial discrimination if "there is no showing by direct or indirect evidence that the decision-maker knew [the plaintiff's race]." Id. (emphasis added).
 
 
 39
 The language in Robinson requiring "direct or indirect evidence" of the defendant's knowledge plainly allows plaintiffs to offer circumstantial, indirect evidence of the defendant's knowledge. Moreover, Robinson recognized that where an employer puts forth an affidavit denying knowledge of the plaintiff's race, "the credibility of the [employer] could be a triable issue," provided the plaintiff brings forward some evidence to challenge the employer's credibility. Id.
 
 
 40
 In this case, Chemcentral moved for summary judgment on grounds that Favreau had offered "no evidence" that Chemcentral supervisors knew his wife's race. The district court agreed, concluding that Favreau had "fail[ed] to prove that any of Chemcentral's executives knew that Favreau's wife is African American." In reaching this conclusion, the district court relied on depositions from two of Favreau's supervisors, including the supervisor who fired him, in which the supervisors denied knowledge of Favreau's wife's race. It also relied on the deposition of an employee who chanced to encounter Favreau and his wife in a social setting outside Favreau's work environment, in which that employee stated that he had not informed any Chemcentral employee of Favreau's wife's race.
 
 
 41
 We disagree with the district court's conclusion because we find circumstantial evidence in the record to make "the credibility of [Chemcentral supervisors] ... a triable issue." Robinson, 847 F.2d at 1315. Although Favreau concedes that he has no direct evidence that his supervisors knew his wife's race, he advances circumstantial evidence to support such an inference.
 
 
 42
 Favreau and his wife encountered a Chemcentral employee at a Laughlin, Nevada casino on March 20, 1993, approximately three months before Favreau was terminated. Although that employee swore in his deposition that he never told anyone at Chemcentral that Favreau's wife is black, there is evidence that the employee at least told his co-workers that he had seen Favreau in Laughlin: Favreau testified that the week after the chance encounter at Laughlin, other Chemcentral employees asked him about his visit to the Laughlin casino.
 
 
 43
 Furthermore, the record reflects that prior to the time the Chemcentral employee saw Favreau and his wife in Laughlin, Favreau had enjoyed favorable performance reviews at Chemcentral, but that Favreau's negative performance reviews began several weeks after the Laughlin encounter. Favreau was hired in May 1990, received five raises by November 1992, was appointed Quality Committee Chairman, and was told he was a candidate for future promotion. As late as March 16, 1993, Favreau received a "satisfactory" rating on an evaluation form.
 
 
 44
 In May 1993, however, two months after the Laughlin trip, Favreau began experiencing disciplinary action, which included reprimands for incomplete surveys of his sales territory and incomplete reports on customer accounts as well as a June memo from Chemcentral's sales manager listing complaints from key customers, low numbers of price reports, and sales achievements below the average for the Los Angeles sales force. A subsequent memo from Favreau's manager to the regional manager cited the same information contained in the sales manager's memo, and mentioned a "personality conflict" between Favreau and the sales manager. A common theme in the internal memoranda was that Favreau had shown promise as Quality Committee Chairman but had performed poorly in his role as salesman.
 
 
 45
 Favreau also alleges that manager Don Fogarty told him on June 10, 1993, "we do not like your kind here," and insists that the phrase "your kind" was a derogatory remark about Favreau's interracial marriage. Favreau also claims various Chemcentral managers and employees exhibited occasional racial discrimination, and alleges various racially derogatory remarks in the workplace. Favreau was fired June 30, 1993.
 
 
 46
 In our view, the timing of the disciplinary action against Favreau, which began mere weeks after the Chemcentral employee saw Favreau and his wife in Laughlin, calls into question the credibility of the two Chemcentral supervisors who swore in their depositions that they were unaware of Favreau's wife's race, and that of the Chemcentral employee who denied having told other co-workers of Favreau's wife's race. Because that circumstantial evidence makes the employer's credibility "a triable issue," see Robinson, 847 F.2d at 1315, and thus Favreau has raised a material issue of fact as to the FEHA claim, we remand to the district court for further proceedings on this claim.
 
 CONCLUSION
 
 47
 We reverse the district court's summary judgment order for Chemcentral with respect to all three claims, and we remand for further proceedings.
 
 
 48
 KOZINSKI, Circuit Judge, dissenting in part.
 
 
 49
 To defeat Chemcentral's motion for summary judgment, Michael Favreau was required to offer some evidence that his employer knew his wife's race. See Robinson v. Adams, 847 F.2d 1315, 1316 (9th Cir.1987). Favreau presented no direct evidence on this score: He never took his wife to any firm functions; never told anyone at Chemcentral she is black; never displayed her picture at the office. Each of the supervisors responsible for terminating Favreau declared, under penalty of perjury, that they were unaware of her race. The only person at Chemcentral who is alleged to have seen Favreau's wife--a plant worker who played no role in Favreau's termination--swore not only that he never mentioned her race to anyone at Chemcentral, but that he couldn't even remember their momentary chance meeting.
 
 
 50
 My colleagues nevertheless conclude there is enough "circumstantial evidence in the record" to call into question the sworn statements of these three declarants. Maj. op. at 14. What does the majority have in mind? First, that Favreau began receiving "negative performance reviews" a few weeks prior to his termination. Id. But unfavorable reviews normally precede a termination for cause. In fact, had Favreau gotten good reviews and then suddenly been fired, that would have been strong proof of discrimination; the tune can be played in both keys. The majority offers no reason to discredit the adverse evaluations, which are primarily based on objective evidence--failure to complete required surveys and account reports; complaints from key customers; poor sales; and skipping scheduled meetings with supervisors. Under California law, which we are bound to apply in this diversity case, a "discharged employee, to avert summary judgment, must produce 'substantial responsive evidence' that the employer's [reason for discharge] was untrue or pretextual." Martin v. Lockheed Missiles & Space Co., 29 Cal.App. 4th 1718, 1735 (Cal.Ct.App.1994). Favreau has not just failed to produce "substantial responsive evidence" to counter Chemcentral's legitimate reasons for firing him--he has produced no evidence at all.
 
 
 51
 The majority also points to a statement by Favreau's supervisor, Donald Fogarty, that "we don't like your kind here." But without independent proof that Fogarty knew Mrs. Favreau's race, there is no reason to assume that "your kind" refers to workers who marry blacks. It could just as easily mean people who are rude to customers or who have a bad attitude toward supervisors. We can speculate but, as our caselaw makes clear, speculation is not evidence. We have held repeatedly that ambiguous statements like this are insufficient to create a genuine issue of material fact as to an employer's motives. For example, in Nesbit v. Pepsico, 994 F.2d 703, 705 (9th Cir.1993), we affirmed a grant of summary judgment in favor of a defendant who, charged with age discrimination, had pronounced that "[w]e don't necessarily like grey hair" and "[w]e don't want unpromotable fifty-year olds around." Likewise, in Nidds v. Schindler Elevator Corp., 103 F.3d 854, 856 (9th Cir.1996), we affirmed a grant of summary judgment in favor of another age discrimination defendant who had proclaimed a desire to get rid of all the "old timers." These statements were far less ambiguous than the one made here by Fogarty, yet we wisely refused to force the defendants to bear the cost of a needless and expensive trial.
 
 
 52
 By struggling to make something out of nothing, the majority creates conflicts both with California law and our own caselaw. Favreau has offered no evidence that those who terminated him knew his wife's race, or that if they did, they fired him for that reason rather than incompetence. I dissent.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The passage in Toussaint to which Favreau refers reads:
 While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced.... No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies or practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee.
 Toussaint, 292 N.W.2d at 892.
 
 
 [2]
 California courts look to federal anti-discrimination legislation for guidance in interpreting FEHA provisions. Mixon, 237 Cal.Rptr. at 890
 
 
 [3]
 The prima facie case for discriminatory discharge may be stated as follows: (1) The complainant belongs to a protected class; (2) his job performance was satisfactory; (3) he was discharged; and (4) others not in the protected class were retained in similar jobs, and/or his job was filled by an individual of comparable qualifications not in the protected class. Mixon, 237 Cal.Rptr. at 891