[No. B107992. Second Dist., Div. Seven. May 17, 1999.]

NANCY NELSON, Plaintiff and Respondent, v.
LONI ANDERSON et al., Defendants and Appellants.

116

## COUNSEL

Law Office of James T. Duff, James T. Duff; Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., and Eve H. Shapiro for Defendant and Appellant Loni Anderson.

Gibson, Dunn & Crutcher, John H. Sharer, James P. Fogelman and Seth M. M. Stodder for Defendants and Appellants Musick, Peeler & Garrett and Geoffrey C. Brown.

Law Offices of James R. Rosen, James R. Rosen and Donald B. Rosen for Plaintiff and Respondent.

## OPINION

**WOODS, J.**—Appellant Loni Anderson contends respondent had no standing to bring this action as an individual, but should have brought a derivative action on behalf of the corporation of which the two were the sole shareholders. We agree, and reverse the judgment. The corporation's attorneys, Musick, Peeler & Garrett, who obtained a defense verdict in respondent's action against them for malpractice, appeal from an order taxing costs. We reverse the order in part and affirm in part.

### FACTUAL AND PROCEDURAL BACKGROUND

Respondent Nancy Nelson formed a corporation, Lonan, Inc., with appellant, television actress Loni Anderson, for the purpose of marketing skin care products. When the business venture failed, Nelson sued Anderson and the corporation's attorneys, Musick, Peeler & Garrett, and one of its partners, Geoffrey C. (Geoff) Brown, for intentional and negligent interference with contract and prospective economic advantage, and attorney malpractice as to the attorneys. The second amended complaint, filed July 19, 1996, also alleged that the failure of the corporation was caused by Anderson's breach of her fiduciary duties as the majority shareholder. Nelson dismissed the interference with contract claims before trial.

In furtherance of the venture, Lonan had formed business relationships with Levlad Incorporated and Television Marketing Group, Inc. (TMG), which were also plaintiffs in the action. Levlad and TMG settled prior to jury selection, and the matter proceeded to jury trial with Nelson as the sole plaintiff.

Nelson had been a television personality for many years, and eventually became one of the best "infomercial" hosts in the country.[1] In early 1993, Nelson decided to concentrate her efforts on developing her own product, a women's skin care line. Recognizing she was not glamorous or pretty enough to sell such a product, although she was very well known nationally from her infomercials, Nelson wanted a celebrity signature for it, and decided to approach Anderson, whom she had known many years ago in Minneapolis.

---

[1] An infomercial is similar to a television commercial, but runs for approximately thirty minutes instead of one or two. A toll-free number appears on screen so that viewers can call to order the product advertised ("direct-response" marketing).

Anderson invited Nelson to her home to make a presentation, which she did in March 1993. Also invited were Anderson's business managers and her attorneys, Mark Grushkin and Geoff Brown, partners in the firm of Musick, Peeler & Garrett, whom Anderson had retained to represent her with regard to the FBI's investigation of Elan, a company which had sold inferior cosmetics, using Anderson's name without authorization. Nelson proposed to market nine types of cosmetic product lines, packaged with a "free gift" and an instructional videotape with Anderson or a model demonstrating the products. She suggested several marketing approaches, among them, telemarketing, retail, mail order, and television, including half-hour infomercials. She promised that Anderson's name and reputation would be "protected and guarded."

Nelson knew that because of the Elan problem, Anderson wanted to have control of the business, to be in the "driver's seat." It had been Anderson's intention to form her own corporation, so that she would have complete control of it. However, on April 2, 1993, they agreed to form a corporation together. On June 7, 1993, Musick, Peeler & Garrett formed the corporation, called "Lonan," to market the products. Anderson and Nelson were the only shareholders and directors of the corporation. Anderson owned 75 percent of the outstanding shares, and Nelson owned 25 percent. Anderson was elected president and chief executive officer, and Nelson was elected chief operating officer, vice-president, treasurer, and secretary. In a separate agreement, Musick, Peeler & Garrett agreed to provide legal services in exchange for a 2½ percent share in the gross revenue of Lonan.

Actor Burt Reynolds filed for a dissolution of the his marriage to Anderson on June 10, 1993.[2] In July, 1993, Anderson began filming a television series, which caused her to be very busy. In late August 1993, Anderson told Nelson she "had a crush on" Musick, Peeler & Garrett partner, Geoff Brown, and a few days later Nelson learned from Grushkin that Brown and Anderson were involved in a romantic relationship. About a week later, an article about the relationship appeared in the National Enquirer.

Since late June, 1993, Nelson had felt that Brown was interfering with the operation of the company. The first instance of what she considered to be

---

[2]For weeks after the divorce filing, regular cover stories appeared in the National Enquirer and the Star (a publication owned by the same company which publishes the National Enquirer). Anderson testified that the stories were untrue and not authorized by her, and that she gave no interviews to either publication after the filing of the dissolution proceedings. Portions of some of the stories were read into the record, including a cover story in the Star, entitled, "Burt and Loni, the Real Story," which contained such "bullet points" as "No Sex For A Year," "Public battle over Loni's Lavish Spending," and "Both Must Attend Classes To Help Son Adjust." A headline in the National Enquirer, purporting to quote an "Angry Loni," read, "I Want $15,000,000." Another stated, "Burt Gets His Son Back From Loni, I Miss You, Daddy," and in the same article, "Fuming Loni Dumps Burt's Treasures." A later National Enquirer headline proclaimed, "Loni Begged Burt's Pal To Be Her Lover."

interference occurred when he brought in artist, Sachi Kuwahara, in place of the artist selected by Levlad. Then he interfered in a meeting on October 1, 1993, called to plan the infomercial, by arriving unexpectedly with his former girlfriend, Vickie Walls, who worked for an advertising agency, and two of her associates. Nelson felt that they took over the meeting, and in "one of the most disturbing of [her] professional career," they told those present how they felt the infomercial should be put together. Eventually, Nelson thought Brown's interference was destroying the project, and often complained to Grushkin about his involvement.

During March or April 1993, Nelson had approached Levlad, Incorporated, a cosmetics manufacturing firm, to provide the products for the venture. On October 6, 1993, Lonan formed a partnership with Levlad, under a partnership agreement drafted by Musick, Peeler & Garrett. The agreement provided that Anderson would "use her best efforts to be available for advertising and promotional activities."

On October 11, 1993, Nelson learned that Anderson had replaced her as hostess of the planned infomercial, because she thought Nelson looked too old, and that her other projects had not been "classy" enough. Nelson felt devastated, betrayed, and humiliated. She had expected to appear as the hostess of the infomercial, perceived her on-camera selling ability to be the greatest asset she could bring to the project, and would not have participated in it had she known that she would be denied an on-screen role. The next day, Nelson spoke to Anderson by telephone for about a minute or so about her exclusion, but she did not argue with her because she believed Brown was on the extension. Nelson then telephoned Grushkin, and complained to him.

Sometime between October 22 and October 26, 1993, L & L Enterprises entered into a contract with TMG which required TMG to produce a "how-to video" to include in the product packaging, and an "infomercial" to test-market the products. The contract provided that if both L & L and TMG determined the test was successful, TMG was to develop a national direct-response advertising strategy.

Nelson continued with her other work as chief operating officer for Lonan, getting the video box finished, obtaining still photographs and the brochure copy, delivering, picking up, and attending constant meetings. There were " a million things to do." She worked on the enterprise nearly 15 or 16 hours per day, 7 days a week, for several months, without an assistant and without any compensation. She worked with Levlad on nearly a daily basis to develop the packaging and look of the product. She also selected a

shipper and supervised it. She investigated various markets for the products, as well, and traveled to New York, Philadelphia, Las Vegas, Arizona, and Santa Barbara at her own expense, to meet with several television shopping networks and mail order companies. She spent between $20,000 and $33,000 of her own money on marketing activities.

On approximately October 21, 1993, TMG brought Grushkin a proposal from the National Enquirer to run advertisements for the products in its publication on a weekly basis for up to one year in exchange for Anderson's permission to publish stories about her personal life. A representative of the National Enquirer promised not to say anything negative about Anderson, but would print negative stories only about Reynolds, with whom she was still involved in divorce and child custody proceedings. However, if she turned the deal down, negative stories would be printed. Anderson rejected the proposal, because she believed it would destroy her image and her credibility with her public, even though she had cooperated with the publication the previous May.

The infomercial was taped on October 26, 1993. As Nelson watched the taping from a control booth, she could tell it was a "disaster." She thought it was "terrible," and did not have a "snowball's chance" of successfully generating sales. However, she kept her opinion to herself. Instead, she sent to Anderson, Brown, and Levlad a memorandum in which she stated, "Now that we have completed our beautiful infomercial, and even before we go to air, I think we are all feeling the impending success we'll be realizing . . . ." She did not think her true opinion had any relevance.

On November 19, 1993, Nelson wrote to Anderson and Brown, "This is always an exciting and frightening time. After all this incredibly hard work we are finally there. And while we know we have a winner, until they show us the numbers, it is really scary. Cross all of your beautiful fingers and wish us well. Here we go, partner. We have a lot to be thankful for this Thanksgiving. Love, Nancy." In fact, Nelson did not think they had a winner, but saw no point in telling Anderson the truth.

The infomercial resulted in a total of only $13,720 in sales, less than the cost of the air time, and was not considered a success. Bennett Vandebunt, an executive vice-president of a marketing company which produces 12 to 15 infomercials per year, testified as one of Nelson's experts that the infomercial was unconvincing and insincere. He thought the Loni line of cosmetics would have been successful if marketed correctly.

On January 5 and 6, 1994, Nelson worked with the editors in an attempt to improve the infomercial by adding testimonials and speeding up the pace.

However she felt it was "doomed" because its star lacked warmth and sincerity. At the same time, however, she wrote to Anderson, Brown, Grushkin, and Levlad, "Happy New Year. I haven't had anything to report of substance until now, but I am happy to be able to tell you that it looks as if 1994 is going to deliver everything we hoped from our Loni line."

The edited infomercial was run on a small number of stations as a test in February, 1994. In March, Nelson wrote to Anderson, Brown, Grushkin, and Levlad, ". . . As you know, a small test was run in February, and we were very disappointed it did not do well. We were truly surprised. We felt that the newly edited program was very effective and frankly expected it to sell well for us . . . ." Nelson did not tell them the truth because there was no point to it. She testified, "But what is the point? You are polite . . . If it was information that was crucial that would change anything, that would change the direction of the company or the success, or that she could fix or that I could fix, that would be important to communicate . . . It was just being nicer, you know. Just being nicer."

Paying her own expenses caused Nelson to go into debt, and in January, 1994, the financial burden was so great that she considered bankruptcy. She became more and more upset by the debt and how badly the business was going, until one day in March 1994, she collapsed, could not get out of bed, and was unable to function until April 1. Her doctor prescribed Paxil.

In October 1994, Nelson arranged a meeting with the Home Shopping Network, to which she proposed putting Anderson on the air by telephone for a half-hour discussion of her product. The Home Shopping Network "sort of" agreed to air the program, but Brown reminded her that Anderson was too busy and did not approve of the Home Shopping Network, and told her she had no right to make any such commitments. Nelson attended the meeting nevertheless, although she felt the project was dead at that point.

The offer from the National Enquirer was renewed twice in 1994. In December, when the offer was renewed for the third time, a board meeting was held in the offices of Musick, Peeler & Garrett. Nelson felt it was the first opportunity she had to tell Anderson about all that had happened to the company, how disappointed she was, and how she felt Brown had destroyed their effort. Anderson said she was very sorry, that she had not known any of it. She expressed her reasons for not wanting to accept the offer, and how much she disliked the National Enquirer. However, Anderson said she would consider the proposal after consulting other celebrities to determine whether they thought she would be adversely affected by it. Anderson did as she said she would, and in February, 1995, told Nelson she would go forward with it.

However, an agreement was never reached with the National Enquirer.[3] Nothing further was done to promote Lonan's products, and Nelson filed this action on September 7, 1995.

Following the presentation of Nelson's case-in-chief, the trial court granted the defendants' motion for nonsuit as to intentional and negligent interference with prospective business advantage, leaving a cause of action for breach of fiduciary duties against Anderson, and one for legal malpractice against Musick, Peeler & Garrett, and its partner Geoffrey C. Brown. After both remaining causes of action were submitted to the jury on a special verdict form, the jury found in favor of Music, Peeler & Garrett, and against Anderson.

The jury awarded Nelson $565,000, and although it found that Anderson had acted with "fraud, oppression or malice," it was deadlocked as to punitive damages. In order to avoid a mistrial, Nelson waived her right to seek punitive damages, and judgment was entered against Anderson on October 2, 1996. Anderson filed her timely notice of appeal on November 27, 1996, after the trial court denied her motion for judgment notwithstanding the verdict and Nelson's motion for new trial.

Music, Peeler & Garrett and Geoffrey Brown claimed costs of nearly $278,000. Upon Nelson's motion to tax, the trial court reduced or disallowed several specified amounts, including two-thirds of all pretrial costs, which it allocated to the settling plaintiffs, Levlad and TMG. The order taxing costs was entered on December 16, 1996, and Music, Peeler & Garrett filed its timely notice of appeal from the order on February 5, 1997.

DISCUSSION

## I. *Anderson's Appeal*

This appeal comes to us in a rather odd posture. Judgment was entered in favor of Nelson upon a special verdict in which the jury found that Anderson had breached unspecified fiduciary duties as a majority shareholder in a corporation in which Nelson and Anderson were the sole shareholders. ▮ A minority shareholder's action for damages for the breach of fiduciary duties of the majority shareholder is one in equity, with no right to a jury trial. (*Interactive Multimedia Artists, Inc.* v. *Superior Court* (1998) 62 Cal.App.4th 1546, 1555-1556 [73 Cal.Rptr.2d 462]; cf. *Rankin* v. *Frebank Co.* (1975) 47 Cal.App.3d 75, 91-92 [121 Cal.Rptr. 348].)

---

[3]We find no support in the record for the statement in respondent's brief that an agreement was not reached because the National Enquirer lost interest.

Of course, there may be an advisory jury in an equitable action. (*Cutter Laboratories* v. *R. W. Ogle & Co.* (1957) 151 Cal.App.2d 410, 418 [311 P.2d 627].) But the jury in this action did not appear to be advisory. Judgment was entered on the special verdict, and signed by the trial judge without any indication, whether express or implied, of agreement with the verdict or adoption of it. Nor does the order denying Anderson's motion for judgment notwithstanding the verdict contain a straightforward adoption by the trial court. At hearing on the motion, the court stated, ". . . I don't think any of us can tell from the jury verdict . . . whether they specifically decided that [Anderson] had an obligation to do one or the other of the numerous things that the plaintiff presented . . . ."

It is not surprising that it cannot be discerned from the special verdict what obligations were found to have been breached. The jury was not instructed as to what Anderson's duties as a majority shareholder were; nor was it instructed as to the scope of such duties within the circumstances of this case, even though both issues were questions of law for the court to decide. (*Kirschner Brothers Oil, Inc.* v. *Natomas Co.* (1986) 185 Cal.App.3d 784, 790 [229 Cal.Rptr. 899], citing *Jones* v. *H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 115 [81 Cal.Rptr. 592, 460 P.2d 464].) The court should have determined, but did not, what Anderson was obligated to do or to refrain from doing, considering the facts and circumstances of this case. (See *Brown* v. *Halbert* (1969) 271 Cal.App.2d 252, 272 [76 Cal.Rptr. 781, 38 A.L.R.3d 718].)[4]

However, it does not appear that any of the many attorneys involved in this action requested the court to determine the scope of Anderson's duties. As a result, Nelson was permitted to argue that anything she considered to be disadvantageous to her was a breach of Anderson's fiduciary duties, from falling in love with the corporation's attorney, to refusing to trade personal information to the National Enquirer for advertising space in the tabloid, all without any court determination as to the existence or limits of such "duties."

We asked the parties for additional briefing on the standard of review when the jury has been left with the task of defining legal issues, and on the validity of a judgment entered on a jury verdict which has not been expressly or impliedly adopted by the trial court in an equitable action. However, Anderson does not seek reversal because of either error. ▮ Instead, she objects to Nelson's standing to bring the action as an individual, rather than

---

[4]It is apparent from the several requests for further instructions, that the jury had some sense that it had not been given adequate legal parameters with which to make its findings of fact.

bringing a derivative action on behalf of the corporation. Anderson contends that Nelson's allegations of improper management decisions, causing her to lose her investment and prospective profits, amount to an injury to the corporation, not to Nelson individually. Because we agree that Nelson had no individual cause of action, we need not determine the validity of a judgment entered on a verdict in an equitable action, without the express or implied adoption or rejection of it by the trial court.

 " 'It is a general rule that a corporation which suffers damages through wrongdoing by its officers and directors must itself bring the action to recover the losses thereby occasioned, or if the corporation fails to bring the action, suit may be filed by a stockholder acting derivatively on behalf of the corporation. An individual [stockholder] may not maintain an action in his own right against the directors for destruction of or diminution in the value of the stock. . . .' " (*Rankin* v. *Frebank Co.*, *supra*, 47 Cal.App.3d at p. 95.)

 Nelson contends that she suffered injury as an individual, and even if there were injury to the corporation, a derivative action was not her exclusive remedy. She points out that the same facts might give rise to two causes of action, one in favor of the corporation, another in favor of one or more individual shareholders. (See *Sutter* v. *General Petroleum Corp.* (1946) 28 Cal.2d 525, 530 [170 P.2d 898, 167 A.L.R. 271].) Her cause of action was individual, she argues, because she suffered injury to her reputation and emotional distress, and lost her out-of pocket expenses, as well as other employment opportunities.[5]

The test is not whether Nelson's damages were unique, as Nelson's argument suggests; an individual cause of action exists only if the damages were not *incidental* to an injury to the corporation. (See *Jones* v. *H. F. Ahmanson & Co.*, *supra*, 1 Cal.3d at p. 107.) The cause of action is individual, not derivative, only " 'where it appears that the injury resulted from the violation of some special duty owed the stockholder by the wrongdoer and having its origin in circumstances independent of the plaintiff's status as a shareholder.' " (*Rankin* v. *Frebank Co.*, *supra*, 47 Cal.App.3d at p. 95, italics omitted.)

In other words, it is the gravamen of the wrong alleged in the pleadings, not simply the resulting injury, which determines whether an individual action lies. While we agree that in some cases, the same facts regarding injury to the corporation may underlie a personal cause of action, such as

---

[5]Our review of the record reveals no evidence of damage to Nelson's reputation, and respondent's brief refers only to evidence that she feared for her reputation.

intentional infliction of emotional distress, breach of contract, fraud, or defamation, Nelson has not alleged or proved the elements of any such cause of action. (See, e.g., *Sutter* v. *General Petroleum Corp., supra,* 28 Cal.2d at p. 531.)[6]

The second amended complaint alleges that Anderson exercised "complete authority, power, legal and financial control over . . . Lonan, and . . . all aspects of [its] business and management decisions, to the exclusion of Nelson . . . , resulting in the foreseeable deprivation of Nelson's rights as . . . a shareholder." The injurious decisions included Anderson's preventing Nelson from hosting the infomercial without any legitimate business purpose; failing to use her best efforts to promote the product, and sabotaging Nelson's efforts; having a romantic relationship with Lonan's attorney, Brown, and while concealing such relationship, permitting Brown to "inject himself into the creative and promotional aspects of Lonan's conceptual and promotional efforts, knowing Brown had no expertise, experience or skill in the field . . . ," which had a "material, deleterious effect on the success and viability of Nelson's ongoing promotional efforts on behalf of Lonan and on Nelson's reputation in the industry." As a result, Nelson lost her capital investment and potential earnings.[7]

Because all of the acts alleged to have caused Nelson's injury amount to alleged misfeasance or negligence in managing the corporation's business, causing the business to be a total failure, any obligations so violated were duties owed directly and immediately to the corporation. (See *Anderson* v. *Derrick* (1934) 220 Cal. 770, 773 [32 P.2d 1078].) Because the gravamen of

---

[6]Nelson contends that she has alleged and proven a fraud cause of action, and at oral argument, she represented that the jury found fraud; however, there was no such finding on the special verdict form, other than a finding for purposes of punitive damages, that Anderson had acted with fraud, oppression *or* malice, without any indication of which (and the prayer for punitive damages was withdrawn). Nelson suggested that she had a fraud cause of action based upon a false promise to cast Nelson as the infomercial hostess and a fraudulent concealment of the nature of Anderson's relationship with Brown. However, she testified only that it was "decided," that she would be the hostess, and she has not referred to any allegation or proof of words amounting to a promise. And although there was some evidence to suggest that Anderson's relationship with Brown began two months before Anderson revealed it, Nelson has not alleged or proved that she changed position to her prejudice as a result of the concealment, which is required to prove not only actual fraud, but also constructive fraud based upon a breach of fiduciary duty. (See *Tyler* v. *Children's Home Society* (1994) 29 Cal.App.4th 511, 548 [35 Cal.Rptr.2d 291].) We find no substance to Nelson's suggestion.

[7]We do not decide whether the alleged wrongs do or do not amount to actionable breaches of fiduciary obligations, and do not deem it necessary to our holding to do so. We observe, however, that Nelson's major complaint was that Anderson made decisions with which she disagreed, and did so without formal board or shareholder meetings. Lack of formality in a closely held corporation and dissension among shareholders are not unusual or necessarily evil occurrences, as Nelson has argued throughout the proceedings. (Cf. *American Center for Education, Inc.* v. *Cavnar* (1978) 80 Cal.App.3d 476, 490-491 [145 Cal.Rptr. 736].)

the complaint is injury to the whole body of its stockholders, it was for the corporation to institute and maintain a remedial action. (*Toboni* v. *Pennington Millinery Co.* (1959) 172 Cal.App.2d 47, 50 [341 P.2d 845].) A derivative action would have been appropriate if its responsible officials had refused or failed to act. (*Ibid.*; Corp. Code, § 800.)

The economic damages proven at trial were lost profits to the corporation as the result of rejected opportunities: Anderson substituted an inexperienced infomercial hostess in place of Nelson, causing the infomercial to be ineffective; Anderson refused to agree to provide personal information to the National Enquirer in exchange for advertising space; and she refused to allow marketing of the product on the Home Shopping Network. ▮ A lost opportunity to increase corporate assets or net worth is the most common situation in which a derivative action is the only appropriate remedy. (See 2 Marsh's Cal. Corporation Law (3d ed. 1995) § 15.20, p. 1271.)

▮ Nelson suggests that because she did not expressly allege that the value of her stock was diminished as the result of an injury to the corporation, she has successfully alleged an individual injury. Nelson's economic damages were lost capital investment, lost earnings, and lost opportunities. Her expert testified that she was deprived of at least $1,101,754, which represents her share of the profits which might have been earned from a successful infomercial, from retail sales and direct mail solicitations, and from sales which might have been generated on the Home Shopping Network and advertisements in the National Enquirer and other publications.

▮ Shareholders own neither the property nor the earnings of the corporation. (*Miller* v. *McColgan* (1941) 17 Cal.2d 432, 436 [110 P.2d 419, 134 A.L.R. 1424].) Shareholders own only stock, from which their income is derived upon the liquidation of assets or the declaration of dividends by the directors. (*Id.*, at pp. 436-437.) ▮ Nelson had no ownership interest in the profits of Lonan and cannot have been deprived of them. The nature of Nelson's proof establishes that any injury was to the corporation; and since she neither alleged nor proved the breach of a duty owing to her personally, her emotional distress and the loss of her investment were incidental to the injury to the corporation.

Nelson relies on *Smith* v. *Tele-Communications, Inc.* (1982) 134 Cal.App.3d 338 [184 Cal.Rptr. 571], to suggest that her cause of action is necessarily individual because she is the sole minority shareholder. In *Smith*, the majority shareholder manipulated a transaction so that it would obtain a tax benefit in which the sole minority shareholder would not share, enabling

the majority shareholder to retain a disproportionate share of the corporation's *ongoing* value. (See 134 Cal.App.3d at pp. 343-345.) An individual action was appropriate in *Smith*, not because there was a single minority shareholder, but because the injury was done only to that shareholder. ■ Whether there is one minority shareholder or many, an action is individual only if the stock of the individual plaintiff or plaintiffs is the only stock affected adversely. (See *Crain* v. *Electronic Memories & Magnetics Corp.* (1975) 50 Cal.App.3d 509, 520-522 [123 Cal.Rptr. 419].) Here, the corporation lost earnings, profits, and opportunities, rendering *all* the shares valueless. When the injury is to the "whole body of stock," the action must be derivative. (*O'Hare* v. *Marine Electric Co.* (1964) 229 Cal.App.2d 33, 36 [39 Cal.Rptr. 799].)

■ Nelson contends that the requirement of a derivative action under the circumstances of this case would be a "nonsensical application of the law," because an award of damages to the corporation would allow Anderson to share in the recovery, in effect, paying damages to herself. ■ A shareholder derivative suit is an action in equity. (*Nessbit* v. *Superior Court* (1931) 214 Cal. 1, 8 [3 P.2d 558].) A court of equity must " 'make a proper adjustment of the "rights, equities, and interests" of all the parties involved.' [Citation.]" (*C & K Engineering Contractors* v. *Amber Steel Co.* (1978) 23 Cal.3d 1, 11 [151 Cal.Rptr. 323, 587 P.2d 1136].) Thus, the court may equitably distribute damages in a shareholder derivative action to avoid any such "nonsensical" result. (See *Rankin* v. *Frebank Co., supra*, 47 Cal.App.3d at p. 96.)

■ A derivative action may appear to Nelson to be an empty formality when there are only two shareholders, and one of them is the alleged wrongdoer. ■ However, the law demands certain prerequisites to bringing a derivative action which have not been alleged or proven in this case, such as alleging "in the complaint with particularity[, the] plaintiff's efforts to secure from the board such action as plaintiff desires, or the reasons for not making such effort, and . . . further that plaintiff has either informed the corporation or the board in writing of the ultimate facts of each cause of action against each defendant or delivered to the corporation or the board a true copy of the complaint which plaintiff proposes to file." (See Corp. Code, § 800, subd. (b)(2).) "No action may be instituted or maintained" unless there has been compliance with the statute. (*Ibid.*)[8]

Failure to comply with the requirements of the statute deprives a litigant of standing. (*Shields* v. *Singleton* (1993) 15 Cal.App.4th 1611, 1618 [19

---

[8]It is doubtful Nelson could have shown an effort to obtain the action which she desired the corporation to take. Her habit in corresponding with Anderson was to be "polite" and "nicer" by reporting only positive opinions about the progress of the marketing effort. She did not communicate to Anderson about all that had happened to the company, how disappointed she

Cal.Rptr.2d 459].) ■ Since Nelson stated no individual cause of action, brought no action on behalf of the corporation, and had no standing to bring such an action, the judgment must be reversed.

## II. *The Attorneys' Appeal*

### A. *The prevailing party is entitled to all reasonable and necessary costs allowed by Code of Civil Procedure section 1033.5.*

■ Musick, Peeler & Garrett and Geoffrey Brown[9] originally claimed more than $300,000 in costs, but reduced its claim to $278,000 after discovering an erroneously claimed item. Pursuant to Nelson's motion to tax costs, the trial court disallowed all but $25,087.77.[10] MPG's first contention is that the trial court erred when it reduced all of MPG's pretrial costs by two-thirds, without respect to whether the costs were allowable by statute or whether they were reasonably necessary. As the court explained in its minute order granting the motion, it reduced MPG's pretrial costs "because . . . [MPG] settled with the other two Plaintiffs, and . . . one of the terms of those settlements was that MPG would waive its right to collect costs; it would be unfair to Plaintiff Nelson, and would constitute an inappropriate windfall to MPG to allow it to collect all of its pre-trial costs from Nelson." A additional reason to reduce pretrial costs was the court's observation as an "all-purpose judge," "that the driving force on the plaintiffs' side came from . . . [TMG]. Levlad, the other settling plaintiff, was a close second in shaping the litigation.[11] MPG, in deciding to settle with those Plaintiffs and to waive costs, is presumed to have taken that fact, among others, into account." Finally, the court agreed with Nelson that it would be unfair to assess all MPG's costs against her, "[g]iven the disproportionate resources available to Nelson . . . ."

Since MPG was a defendant against whom Nelson obtained no relief, MPG was the prevailing party. (Code Civ. Proc., § 1032, subd. (a)(4).) "Except as otherwise expressly provided by statute, a prevailing party is

---

was, and how she felt Brown had destroyed their effort until a board meeting called in December, 1994. A minority shareholder has a wide range of statutory rights to help her participate in the management of the corporation. (See *Stephenson* v. *Drever* (1997) 16 Cal.4th 1167, 1176-1177 [69 Cal.Rptr.2d 764, 947 P.2d 1301].) There was no allegation made or evidence adduced that Nelson attempted to avail herself of any of them.

[9]We will refer to Musick, Peeler & Garrett and Geoffrey Brown collectively as "MPG" for convenience.

[10]We recite the amount allowed as represented in respondent's brief. The trial court's minute order recites the items reduced or disallowed, but does not state the total allowed, and our copy of the judgment contains no notation of the amount awarded to MPG as costs.

[11]Such a factor might obviously have reduced Nelson's costs, but it is not obvious to us how it might have lessened MPG's costs.

entitled as a matter of right to recover costs in any action or proceeding." (Code Civ. Proc., § 1032, subd. (b).) This means that the prevailing party is entitled to all of his costs unless another statute provides otherwise. (See *Crib Retaining Walls, Inc.* v. *NBS/Lowry, Inc.* (1996) 47 Cal.App.4th 886, 890 [54 Cal.Rptr.2d 850].) Absent such statutory authority, the court has no discretion to deny costs to the prevailing party. (*Ibid.*)

Code of Civil Procedure section 1033 enumerates allowable costs and costs which are not allowable, and restricts allowable costs to those reasonably necessary to the conduct of the litigation. We have found no statutory authority for reducing allowable costs for any of the reasons advanced by the trial court. ■ "A court should be cautious in engrafting exceptions onto the clear language of Code of Civil Procedure section 1032." (*Great Western Bank* v. *Converse Consultants, Inc.* (1997) 58 Cal.App.4th 609, 614 [68 Cal.Rptr.2d 224].) Nor should it " 'read into the statute allowing costs a restriction which has not been placed there. . . .' " [Citation.] (*Crib Retaining Walls, Inc.* v. *NBS/Lowry, Inc. supra,* 47 Cal.App.4th at p. 890.)

■ Nelson compares the reduction to an allocation of the prevailing party's costs among several losing parties, as in *Santantonio* v. *Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102 [30 Cal.Rptr.2d 486]. The comparison is inappropriate. In *Santantonio,* unlike here, Code of Civil Procedure section section 998, subdivision (d), provided statutory authority for the allocation of costs, and the prevailing parties sought only one-third of their section 1033.5 costs as to the appellant. Here, the trial court's order was, in effect, that MPG should bear two-thirds of its own costs.

Nelson also relies on *Santantonio* to support the reduction in consideration of Nelson's more limited resources. We made the observation in *Santantonio* that Code of Civil Procedure section 998 gives the trial court discretion to consider a party's ability to pay costs, when considering costs recoverable under that section. (25 Cal.App.4th at p. 125, fn. 7.) There is no language in section 998 which would transfer the discretion of that section to a motion to tax costs recoverable by the prevailing party under sections 1032 and 1033.5, and unrelated to section 998.[12]

Prior to trial, MPG entered into settlement agreements with TMG and Levlad. Under both agreements, all parties agreed to waive costs. Nelson claims a right to benefit from the cost-waiver provisions of MPG's settlement agreements with TMG and Levlad. She fails to explain, however, how

---

[12]If there were such a provision, it would no doubt require some proof of Nelson's limited resources. (See, e.g., *McDonald* v. *Superior Court* (1994) 22 Cal.App.4th 364, 370 [27 Cal.Rptr.2d 310].) Nelson provided no such proof here.

she might have the right to benefit from a contract to which she is not a party, and from a contract term which she was offered, but rejected. ■ A settlement agreement is a contract, governed by the same legal principles which apply to contracts generally. (*Weddington Productions, Inc.* v. *Flick* (1998) 60 Cal.App.4th 793, 810 [71 Cal.Rptr.2d 265].) ■ One who is not a party to a contract has no right to enforce it unless he is an intended third party beneficiary of the contract. (*Martinez* v. *Socoma Companies, Inc.* (1974) 11 Cal.3d 394, 400 [113 Cal.Rptr. 585, 521 P.2d 841].)

■ We do not imply, as the dissent charges, that a prevailing party is always entitled to 100 percent of its costs, or that it may be entitled to a double or greater recovery when there are two or more plaintiffs. Costs recoverable under section 1032 are restricted to those which are reasonably necessary to the conduct of the litigation and reasonable in amount. (Code Civ. Proc., § 1033.5, subd. (c)(2).) However, an across-the-board reduction based upon the number of plaintiffs, without regard to the reason the costs were incurred, is not a determination of the necessity or reasonableness of the costs.

We do not suggest a trial court is never justified in disallowing costs which were incurred in defense of actions or proceedings unrelated to one or more of the plaintiffs, without regard to whether they were necessary nor reasonable. However, there was no attempt here to distinguish between costs incurred as a result of the actions or tactics of one plaintiff as opposed to another. The trial court's observation that the driving force on the plaintiffs' side came from TMG, might have been a factor in reducing Nelson's costs, had she prevailed, but does little to prove that two-thirds of MPG's costs were not incurred in defense of Nelson's claims in the action.

The court's finding that MPG would enjoy a windfall is not a statutory restriction, as such, but a prevailing party who recovers costs which were neither necessary nor reasonable could be said to enjoy a windfall, a result which we do not advocate. However, since Nelson did not seek the reduction on such grounds, and it is clear the court made no analysis of the reasonableness or necessity of the costs affected by the two-thirds reduction, its "windfall" determination cannot be said to be based upon any statutory restriction, and must be reversed.

B. *MPG was required to prove the reasonableness or necessity of items only if not properly claimed under Code of Civil Procedure section 1033.5.*

■ There were several individual items to which Nelson objected on the statutory grounds of reasonableness or necessity. These consisted of

messenger fees, deposition costs, a portion of costs claimed for service of process, and fees for models, blowups, and photocopies of exhibits. MPG contends the disallowance of a portion of such items was an abuse of discretion.

MPG contends that the court impermissibly imposed upon it the burden to prove the necessity and reasonableness of the costs related to the deposition of Philip Feldman, as well as the other disallowed costs for messenger fees and service of process. In each instance, the trial court found MPG's showing of necessity to be inadequate or incredible, and it is apparent that the costs were disallowed based upon such finding.

Nelson contends that the mere filing of her motion to tax costs shifted the burden to MPG to prove the necessity and reasonableness of the costs. She relies upon language in *Ladas* v. *California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774 [23 Cal.Rptr.2d 810]: "If the items appearing in a cost bill appear to be proper charges, the burden is on the party seeking to tax costs to show that they were not reasonable or necessary. On the other hand, if the items are properly objected to, they are put in issue and the burden of proof is on the party claiming them as costs." Nelson apparently interprets this language to mean that the mere objection to charges which, on the face of the cost bill, appear to be proper, shifts the burden of proving they were reasonable and necessary onto the party claiming them.

We agree the mere filing of a motion to tax costs may be a "proper objection" to an item, the necessity of which appears doubtful, or which does not appear to be proper on its face. (See *Oak Grove School Dist.* v. *City Title Ins. Co.* (1963) 217 Cal.App.2d 678, 698-699 [32 Cal.Rptr. 288].) However, "[i]f the items appear to be proper charges the verified memorandum is prima facie evidence that the costs, expenses and services therein listed were necessarily incurred by the defendant [citations], and the burden of showing that an item is not properly chargeable or is unreasonable is upon the [objecting party]." (*Id.*, at p. 699; see also *Miller* v. *Highland Ditch Co.* (1891) 91 Cal. 103, 105-106 [27 P. 536].)

The court's first determination, therefore, is whether the statute expressly allows the particular item, and whether it appears proper on its face. (Cf. *Ladas* v. *California State Auto. Assn.*, *supra*, 19 Cal.App.4th at pp. 774-776.) If so, the burden is on the objecting party to show them to be unnecessary or unreasonable. (*Decoto School Dist.* v. *M. & S. Title Co.* (1964) 225 Cal.App.2d 310, 317 [37 Cal.Rptr. 225].)

The taking, videotaping, and transcribing of necessary depositions is expressly allowed by statute. (Code Civ. Proc., § 1033.5, subd. (a)(3).)

The trial court disallowed all expenses relating to the deposition of Philip Feldman, because he was Levlad's expert, and MPG failed to show its relevance at trial. In its opposition to the motion to tax costs, MPG submitted a copy of Nelson's joinder in Levlad's designation of Feldman. Although the court allowed the deposition costs related to other experts designated by Nelson's joinder, it did so on the ground that Nelson's other experts relied upon their deposition testimony.

We agree with MPG's contention that the court should have determined need for the deposition "from the pretrial vantage point of a litigant who does not yet know whether or not to oppose the expert's opinions. [Citation.]" (*Brake* v. *Beech Aircraft Corp.* (1986) 184 Cal.App.3d 930, 940 [229 Cal.Rptr. 336].) The expense was expressly allowable by statute, and MPG showed that the witness had been designated by Nelson through her joinder. Nelson therefore bore the burden to prove the cost unnecessary (at the time of incurring it) or unreasonable. The trial court erred in requiring additional proof from MPG, and in making its determination based upon the expert's usefulness at trial.

Messenger fees are not expressly authorized by statute, but may be allowed in the discretion of the court. (*Ladas* v. *California State Auto. Assn.*, *supra*, 19 Cal.App.4th at p. 776; Code Civ. Proc., § 1033.5, subd. (c)(4).) The trial court found the messenger filings to be of doubtful necessity and unreasonable on their face, when compared to the probable cost of alternatives such as mail, Federal Express, or personal filing, in view of the size of the very large firm representing MPG. The burden was therefore properly placed upon MPG, which provided no evidence that the messenger charges were reasonable or necessary.

MPG claimed $4,281 for service of deposition and trial subpoenas. The trial court allowed $2,511, finding MPG had not made an adequate showing as to the remainder. Whether and in what amount the expenses for service of process are allowed depends upon who served the process and what amount is allowed to a public officer in this state for such a service. (Code Civ. Proc., § 1033.5, subd. (a)(4).) Since MPG's memorandum of costs does not state how the subpoenas were served, it cannot be determined from the face of the cost bill whether the items are proper. The verified cost bill was therefore insufficient, MPG had the burden to establish the necessity and reasonableness of the service costs, but did not do so.

MPG claimed $28,784 for models, blowups, and photocopies of exhibits. "Models and blowups of exhibits and photocopies of exhibits may be allowed if they were reasonably helpful to aid the trier of fact." (Code Civ.

Proc., § 1033.5, subd. (a)(12).) The court disallowed expenses relating to the use of videotapes and laser discs. It held: "It is certainly not inappropriate for a party to choose cutting edge technology to present its case to a jury. But that does not mean that it can automatically pass the high cost of that technology to the other side, especially when it is used only sporadically during the trial, and when many times when counsel attempted to use it, they were unable to and reverted to traditional 'low tech' methods for presenting the evidence."

Burden of proof is not an issue in this instance, since, having presided over the trial, the trial court had all the evidence needed to determine whether the items claimed were reasonably helpful to the trier of fact, and was in the best position to make the determination. MPG refers to authority upholding a court's discretion to award of costs for items claimed as models, blowups, or photocopies of exhibits, when not used at trial due to a last-minute dismissal. (See *Applegate* v. *St. Francis Lutheran Church* (1994) 23 Cal.App.4th 361, 363-364 [28 Cal.Rptr.2d 436] [voluntary dismissal]; *Regan Roofing Co.* v. *Superior Court* (1994) 21 Cal.App.4th 1685, 1710 [27 Cal.Rptr.2d 62] [settlement].) There were no such circumstances here, and MPG has not shown that the trial court's determination was an abuse of discretion.

C. *MPG has not carried its burden to show reversible error in the trial court's disallowance of costs claimed pursuant to Code of Civil Procedure section 998.*

 Based upon the same facts upon which Nelson based her allegations of breach of Anderson's fiduciary duties, Nelson sought damages against MPG for intentional and negligent interference with prospective economic advantage and attorney malpractice. Prior to trial, MPG served Nelson with an offer of compromise pursuant to Code of Civil Procedure section 998. MPG offered to pay Nelson the sum of $5,000, each party to bear its own costs and attorneys fees, in exchange for a dismissal and general release. Nelson did not accept the offer, and it expired.

After Nelson presented her evidence, the trial court granted MPG's motion for nonsuit as to the intentional and negligent interference claims. The jury found by special verdict that no attorney-client relationship existed between MPG and Nelson, and judgment was entered for MPG. The trial court taxed all costs claimed by MPG pursuant to Code of Civil Procedure section 998, on the ground that the offer was a "token" offer, which was not reasonable or made in a good faith effort to settle.

■ A prevailing party who has made a valid pretrial offer pursuant to Code of Civil Procedure section 998 is eligible for specified costs, so long as the offer was reasonable and made in good faith. (*Elrod* v. *Oregon Cummins Diesel, Inc.* (1987) 195 Cal.App.3d 692, 698-699 [241 Cal.Rptr. 108].) Whether a section 998 offer was reasonable and made in good faith is left to the sound discretion of the trial court. (*Id.*, at p. 700.) Because MPG prevailed in the action, its 998 offer is presumed to have been reasonable, and it was Nelson's burden to show otherwise. (See *Santantonio* v. *Westinghouse Broadcasting Co.*, *supra*, 25 Cal.App.4th at p.117.) However, on appeal, MPG has the burden of establishing an abuse of discretion. (See *Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 331 [216 Cal.Rptr. 718, 703 P.2d 58].)

Even a modest or "token" offer may be reasonable if an action is completely lacking in merit. (*Culbertson* v. *R. D. Werner Co., Inc.* (1987) 190 Cal.App.3d 704, 709-710 [235 Cal.Rptr. 510].) ■ MPG contends that its offer of $5,000 and a waiver of costs was reasonable, because Nelson failed to show that her action had merit; and further, that the action did not have merit, because Nelson presented no evidence of an attorney-client relationship, and even admitted that MPG was the corporation's counsel, not hers individually.

We do not agree that the lack of evidence of an attorney-client relationship is dispositive as to whether Nelson's action against MPG had merit. ■ An action for professional negligence does not necessarily require an attorney-client relationship. (*Meighan* v. *Shore* (1995) 34 Cal.App.4th 1025, 1041 [40 Cal.Rptr.2d 744].) Determining whether an attorney owed a duty to a nonclient is a matter of policy and involves the balancing of various factors. (*Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 343 [134 Cal.Rptr. 375, 556 P.2d 737], citing *Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358].)[13]

■ However, it does not appear that the court or the parties considered MPG's potential liability in any context other than an attorney-client relationship, or that Nelson ever intended or attempted to establish a duty by balancing policy factors. The trial court relied upon *Johnson* v. *Superior*

---

[13]Among the factors considered are "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (49 Cal.2d at p. 650.)

*Court* (1995) 38 Cal.App.4th 463 [45 Cal.Rptr.2d 312], in which it was held that an attorney for a limited partnership can be found to represent a limited partner, if there is evidence that the parties entered into such a relationship. (38 Cal.App.4th at p. 470.) The trial court held by analogy to *Johnson*, that an attorney-client relationship can exist between a shareholder and the corporation's attorney, and therefore, liability was an "unsettled" issue.

Whether or not an attorney may be found to have agreed to represent a shareholder of his corporate client, there clearly was no such relationship here. Nelson never alleged facts amounting to the formation of an attorney-client relationship, and at trial, Nelson presented no evidence of an attorney-client relationship with MPG. Nelson testified that she understood that MPG represented the corporation and not her individually. Just prior to the formation of the corporation, MPG obtained Nelson's signature on a letter disclosing that it would be representing the corporation, not either of its shareholders, and suggesting that she obtain independent counsel. MPG partner Mark Grushkin testified that he dealt with Nelson only as an employee of the corporation.

We therefore agree with MPG's contention that Nelson's action had no merit, and we disagree with the trial court's assessment, made after trial, that liability was a close issue. That does not necessarily mean, however, that the section 998 offer was reasonable. ▪ " 'As a general rule, the reasonableness of a defendant's offer is measured, first, by determining whether the offer represents a reasonable prediction of the amount of money, if any, defendant would have to pay plaintiff following a trial, discounted by an appropriate factor for receipt of money by plaintiff before trial, all premised upon information that was known or reasonably should have been known to the defendant. It goes without saying that a defendant is not expected to predict the exact amount of his exposure. If an experienced attorney or judge, standing in defendant's shoes, would place the prediction within a range of reasonably possible results, the prediction is reasonable. . . .

" 'If the offer is found reasonable by the first test, it must then satisfy a second test: whether defendant's information was known or reasonably should have been known to plaintiff. This second test is necessary because the section 998 mechanism works only where the offeree has reason to know the offer is a reasonable one. If the offeree has no reason to know the offer is reasonable, then the offeree cannot be expected to accept the offer.' "

(*Colbaugh* v. *Hartline* (1994) 29 Cal.App.4th 1516, 1528 [35 Cal.Rptr.2d 213], italics omitted, citing *Elrod* v. *Oregon Cummins Diesel, Inc., supra,* 195 Cal.App.3d at p. 699.)

 We agree with MPG that, under the first test, a $5,000 offer was within the range Nelson could expect to recover, because, without the pleading of any duty, or any proof of the duty she purported to plead, she could not expect to recover anything, and the trial court erred in finding otherwise. However, MPG bears the burden on appeal to show the trial court erred as to the second part of the test of a reasonable offer as well. "The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' [Citations.]" (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].) " 'A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' [Citations.]" (*Denham* v. *Superior Court, supra,* 2 Cal.3d at p. 564, italics omitted.)

 MPG has not shown what Nelson knew or should have known regarding her likelihood of recovering damages. The record comes before us in the form of appellant's and respondent's appendices, which do not contain much of the pretrial record.[14] We cannot tell from this record whether MPG demurred to any of Nelson's complaints, or brought a motion for judgment on the pleadings or a motion for summary judgment, or whether the weaknesses of Nelson's case were brought to her attention in some other way.[15] (See *Elrod* v. *Oregon Cummins Diesel, Inc., supra,* 195 Cal.App.3d at p. 699.) It was MPG's burden, as the appellant, to provide a record sufficient to determine whether the result would have been different in the absence of error, and since it did not do so, the trial court's discretion cannot be disturbed. (See *Jones* v. *Dumrichob* (1998) 63 Cal.App.4th 1258, 1264 [74 Cal.Rptr.2d 607].)

---

[14]Nor has MPG chosen to include its motion for nonsuit or its motion for directed verdict in its appendix. MPG asserts at page 8 of its brief, that the court erroneously allowed the malpractice claim to go to the jury, but does not reveal how the decision was made.

[15]We enumerate only examples of evidence of notice to the offeree. We do not hold that an offer is unreasonable unless the offeree understands the legal effect of any information relevant to the reasonableness of the offer; nor do we hold that an offeror has a duty to advise the offeree of the legal effect of any such information.

DISPOSITION

The judgment against Anderson is reversed. Anderson shall receive her costs on appeal. The order granting Nelson's motion to tax costs, dated December 16, 1996, is reversed in part as follows: The reduction of all pretrial costs by two-thirds is reversed; the disallowance of the costs relating to the deposition of Philip Feldman (but not expert's fees) is reversed. In all other respects, the order granting motion to tax costs is affirmed. MPG shall receive its costs on appeal.

Lillie, P. J., concurred.

**JOHNSON, J.,** Concurring and Dissenting.—I concur in the judgment as to all issues except the majority's reversal of the trial court's order reducing by two-thirds the cost award to appellant Musick, Peeler & Garrett.

In my view, the trial judge was well within her discretion in determining the "reasonable amount" of defendant's costs respondent owed only included respondent's proportionate share of the total costs appellant had to lay out in defending against all three plaintiffs. Appellant law firm does not have an absolute right to recover all its costs against respondent after gaining the benefit of absolving the other plaintiffs of any responsibility for their share of the cost bill when it concluded its settlement agreements with those plaintiffs.

The majority opinion implies the trial court lacks discretion to do anything other than award a prevailing party its full costs from whichever party or parties it chooses to seek its cost award. But this is plainly wrong. It is axiomatic Code of Civil Procedure 1032 and its associated code provisions only authorize a prevailing party to receive the benefit of its reasonable costs once. That is, in multiparty litigation the prevailing party is not entitled to obtain 100 percent of its costs from one opponent, then 100 percent of its costs from a second, then 100 percent from a third, for a total of 300 percent. So apportionment of some sort is nearly inevitable where one party incurs costs in litigation against multiple opponents. As a correlative, unless the parties agree among themselves the percentage of costs each plaintiff shall bear, the trial court must do the apportioning—and exercise its discretion in doing so.

If this case had gone to trial and defendant prevailed against all three plaintiffs, no one would dispute defendant would only have been entitled to recover a total of 100 percent of its reasonable costs apportioned somehow

among the three plaintiffs. Furthermore, assume as happened here, two of the three plaintiffs settled with defendant, but the settlement agreements specifically required those settling plaintiffs to pay an identified portion of defendant's costs. In that instance, the plaintiff who lost at trial would have been able to tax defendant's total cost bill by the amounts the other plaintiffs had paid out to defray defendant's costs.

One has to be blind to reality to assume the settlement agreements respondent reached with the settling plaintiffs in this case failed to take into account—in one way or another—appellant's entitlement to the costs it incurred in defending these two plaintiffs' actions. In some cases a defendant may reduce the amount it would otherwise pay the plaintiff in damages as part of the settlement by the amount of costs to which it would be entitled after a dismissal of the action pursuant to that settlement. In other words, instead of paying out $500,000 in settlement of plaintiff's "damages" claim and taking back $100,000 in "costs" it would be owed after plaintiff's voluntary dismissal of its action, the defendant offers $400,000 in "damages" and foregoes its entitlement to "costs" after settlement. In other cases, in order to gain a settlement a defendant may pay the plaintiff nothing but forego the costs it would otherwise be entitled to after a dismissal. This is the substantial equivalent of giving a plaintiff that sum of money as an inducement to settle.

Either way the net result is the same. The defendant obtains a benefit equal to the costs it could have received from the settling plaintiff.[1] And, either way the defendant should not be entitled to gain a double benefit by collecting the entire cost bill from a nonsettling plaintiff in the same litigation.

In the instant case, the trial court acted reasonably in determining appellant already obtained a benefit equal to two-thirds of the total cost bill as part

---

[1] Ironically, in its own brief appellant law firm recognizes a defendant's offer to forego costs it otherwise would be owed is the equivalent of an offer to pay out that same sum in cash as a means of obtaining a given plaintiff's agreement to settle the case. In arguing why its $5,000 offer to settle respondent Nelson's suit was a "reasonable" offer and thus one entitling appellant to its expert witness fees, appellant's brief argues, "the trial court ignored the fact that MPG and Brown offered to waive approximately $100,000 in recoverable costs at the time of the Offer, in addition to paying Nelson $5,000, *rendering the value of the Offer much more* than the 'modest' one authorized in *Culbertson.*" Likewise, appellant undoubtedly used the waiver of those same costs as a substitute for cash in gaining settlements with the other two plaintiffs. The trial court could properly conclude respondent had already received at least two-thirds of the "reasonable amount" of its costs from the settling plaintiffs just as if those settlement agreements had specifically included those plaintiffs' payment of a portion of defendant's costs.

of its settlement with the two settling plaintiffs. Consequently, in my view the court also was well within the bounds of its discretion in deciding the "reasonable amount" of appellant's costs remaining to be collected from respondent, the nonsettling plaintiff, was one-third of those costs, not the full amount. Accordingly, were I in the majority I would affirm that portion of the judgment.

A petition for a rehearing was denied June 14, 1999, and the opinion was modified to read as printed above. The petitions of both respondent and appellants Musick, Peeler & Garrett and Geoffrey C. Brown for review by the Supreme Court were denied September 15, 1999.