Filed 11/25/13  Mandosa v. Regents of the University of California CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RITA SABINA MANDOSA,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | B237290<br><br>(Los Angeles County<br>Super. Ct. No. SC107660) |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County.  Gerald Rosenberg, Judge.  Affirmed.

Law Offices of Violet C. Rabaya for Plaintiff and Appellant.

Garrard & Davis, Donald A. Garrard, Steven D. Davis and Diane M. Daly for Defendant and Respondent.

\* \* \* \* \* \*

Plaintiff and appellant Rita Sabina Mandosa brought an action for professional negligence against defendant and respondent the Regents of the University of California (Regents), alleging that several doctors were negligent in the diagnosis and treatment of a condition known as Charcot foot. By special verdict, a jury concluded that two doctors were negligent, six were not, and any negligence was not the cause of appellant's injuries. The trial court thereafter denied appellant's motions for judgment notwithstanding the verdict and for a new trial, granted in part appellant's motion to tax costs and denied her motion for reconsideration and renewed motion to tax costs.

We affirm. Though we conclude that appellant has waived her substantial evidence argument by presenting only the evidence favorable to her position, we would find the verdict amply supported by substantial evidence in the form of testimony from treating physicians and experts. Moreover, the trial court properly exercised its discretion in denying appellant's posttrial motions seeking to overturn the verdict. Finally, the trial court properly exercised its discretion limiting the hearing on the initial motion to tax costs and in denying appellant's unmeritorious and untimely efforts to modify the partial denial of that motion.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Appellant's Hospitalization.*

Matthew Leibowitz, M.D., board certified in infectious diseases and an associate professor at the University of California at Los Angeles (UCLA) Medical School, had previously treated appellant for a urinary tract infection. Appellant's medical history included type-two diabetes with significant peripheral neuropathy and retinopathy. The latter two conditions were complications of diabetes and consisted of decreased sensation in the feet and decreased vision caused by abnormal blood vessel growth in the retina.

At the recommendation of her primary care physician, appellant saw Dr. Leibowitz on May 18, 2009, both as a follow-up for her most recent urinary tract infection and because her left foot was red and swollen. Appellant presented with symptoms of increasing pain, redness and swelling in her left foot, which Dr. Leibowitz opined were classic symptoms of cellulitis. Appellant had also complained of fever and

2

night sweats during the two days before her visit—symptoms also consistent with cellulitis. May 15, 2009 blood tests taken in connection with appellant's urinary tract infection were also available to Dr. Leibowitz, and appellant's elevated white blood cell count was consistent with an infection. In addition, peripheral neuropathy is a predisposing factor to cellulitis. Dr. Leibowitz knew appellant's symptoms were also consistent with a rare condition known as "acute Charcot foot" or "impending Charcot foot," but he had never before encountered a patient with that condition. Acute Charcot foot involves the presentation of a red, hot, painful and swollen foot that quickly progresses to fractures and/or dislocation of the bones in the foot. During appellant's initial visit, Dr. Leibowitz did not consider Charcot foot or acute Charcot foot as a possible diagnosis. Appellant's symptoms were consistent with those exhibited by hundreds of patients he had treated for cellulitis. Acute Charcot foot typically would not involve the symptoms of fever and night sweats.

In view of his cellulitis diagnosis, Dr. Leibowitz directed that appellant be admitted to the UCLA Medical Center (hospital) that day for treatment with intravenous antibiotics. Third year internal medicine resident Yuliya Linhares, M.D., admitted her to the hospital, independently concluding on the basis of an examination, appellant's symptoms and medical history that appellant was suffering from cellulitis. Hamid Hajomenian, M.D., an assistant clinical professor board certified in internal medicine and nephrology, supervised her. He concurred that the clinical findings were consistent with a diagnosis of cellulitis and did not consider a diagnosis of Charcot foot. Because bed rest would not have been appropriate treatment for cellulitis, hospital personnel permitted and even encouraged appellant to walk during the next few days.

Appellant had an X-ray of her foot taken when she was admitted in order to rule out osteomyelitis, a deep tissue and bone infection that can be a complication of cellulitis and must be treated differently. Had the X-rays been designed to rule out Charcot foot, an additional view would have been taken. Kambiz Motamedi, M.D., a UCLA associate professor and board certified radiologist specializing in musculoskeletal imaging, reviewed the X-rays and found soft tissue swelling and no bony abnormalities indicative

3

of osteomyelitis. He also saw a slight shift in certain bones, within the limit of that which can be caused by soft tissue swelling. He found no evidence of Charcot arthropathy, and observed neither fractures nor fragmentation. In his view, the alignment of the bones—specifically that of the navicular relative to the cuneiforms—was within normal limits. Dr. Motamedi had never diagnosed Charcot foot before observing malformation of the foot's five articulating bones.

Appellant's symptoms on May 19, 2009 remained consistent with cellulitis. By May 20, 2009, appellant reported that her condition had improved and she was not running a fever, though she had suffered from night sweats and chills the previous night. Dr. Leibowitz reviewed the results of blood tests taken on May 18 and 19, 2009 that were consistent with an infection and his diagnosis of cellulitis. Had Dr. Linhares received an X-ray report that indicated a slight subluxation of the navicular and medial cuneiform bones, she would not have changed her diagnosis, though she might have added the possible diagnosis of Charcot foot.

Appellant's ankle remained swollen on May 21, 2009, though her white blood cell count had decreased. Taking over for Dr. Linares, UCLA internal medicine resident Kristina Vander Wall, M.D., first saw appellant that day. Dr. Vander Wall's examination revealed that appellant's ankle remained red, swollen and warm to the touch. She concurred with the diagnosis of cellulitis, and that was consistent with Dr. Hajomenian's continued diagnosis. On May 22, 2009, Dr. Vander Wall observed a slight improvement in the redness and swelling of appellant's left foot. Dr. Hajomenian noticed that there was a redistribution of erythema in appellant's foot and ankle when elevated, a condition he had seen in cases of cellulitis.

The next day, May 23, 2009, Dr. Vander Wall noticed continued improvement but also observed a mild bony abnormality on the dorsum of appellant's left foot. She first saw the abnormality by herself during morning rounds, and saw it again during afternoon rounds with attending physician Brian Young, M.D. She did not consider a diagnosis of Charcot foot at that point, nor did she feel that further testing was indicated. She had never treated a patient suffering from Charcot foot. She was aware, however, that a

4

patient suffering from Charcot foot should be monitored for marked bony abnormal subluxations and fractures.

Dr. Vander Wall saw appellant in the morning on May 24, 2009 and, in response to appellant's request, permitted her to take a shower. The bony prominence on appellant's foot remained unchanged. Later that same morning, Dr. Vander Wall saw appellant with David Taylor, M.D., the attending physician who also worked as an assistant professor and clinical training supervisor. At that point, Dr. Taylor noticed a bony abnormality on appellant's foot, and Dr. Vander Wall told him it was a meaningful change in the foot. She and Dr. Taylor ordered X-rays. Dr. Taylor was concerned that appellant had sustained an acute injury related to Charcot foot, though he conducted research before reaching that diagnosis. They also directed appellant to stay off her feet.

Dr. Taylor received the X-ray results the same afternoon, which showed multiple abnormalities, including that the tarsal row had shifted and dislocated and the base of the fourth metatarsal had fragmented. He instructed appellant to remain off her feet and consulted podiatry. A radiology report received the following morning indicated that "overall this collapse is consistent with neuropathic arthropathy, Charcot joint."

Dr. Vander Wall was off on May 25, 2009, and when she returned to work on May 26, 2009, she and Dr. Taylor examined appellant and confirmed the diagnosis of Charcot foot on the basis of the X-rays and their examination.

On May 26, 2009, Ottoniel Mejia, D.P.M., a doctor of podiatric medicine affiliated with the University Podiatry Group at UCLA Medical Plaza who had experience with Charcot deformity, was brought in as a consultant. Following an examination, he diagnosed appellant as having Charcot arthropathy of the left leg. He explained that Charcot arthropathy has three phases. The first or "acute" phase is characterized by redness and swelling and can last for weeks or months. During this phase, the bones become brittle and fracture, and dislocations occur. The second or "coalescence" phase is where the bones begin to heal and can also last for months. The third or "remodeling" phase is when the foot tries to stabilize itself and the bones try to remodel to their original configuration. He had never observed acute Charcot foot before

dislocation. He would not have recommended casting appellant's foot on the basis of the symptoms she was exhibiting when she was first hospitalized.

Reviewing the May 24, 2009 X-ray, Dr. Mejia saw fractures and dislocations of the mid-foot joints in appellant's left foot. He attributed the presence of such micro-fractures to a combination of theories—the wear and tear from a neuropathic patient not being able to feel her feet and also to increased blood flow and damage to the nerves caused by diabetes. Such fractures can take years to develop. He recommended that appellant not put any weight on her foot to prevent further collapse. He saw appellant again on June 23, 2009 after she had been discharged from the hospital and observed no further breakdown of her Charcot deformity. By October 2009 her foot was healing.

Since being discharged from the hospital, appellant has been unable to return fully to her previous lifestyle, and her day-to-day activities have been significantly curtailed.

***Pleadings and Offer to Compromise.***

In April 2010, appellant filed a complaint for professional negligence against Drs. Leibowitz, Vander Wall, Linhares, Hajomenian and Taylor, and the Santa Monica UCLA Medical Center and Orthopaedic Hospital. She generally alleged that she suffered injury as a result of defendants' breach of the applicable standard of care by "(a) failing to properly perform necessary examinations in a timely manner; (b) failing to properly observe and diagnose the full extent of Plaintiff's symptoms; (c) failing to properly inform and warn Plaintiff of the true nature and extent of her symptoms; (d) failing to properly inform and warn Plaintiff of the appropriate treatments and the risks thereof, and the proper course of follow-up care; (e) failing to properly obtain informed consent for the services and treatments provided; (f) failing to properly treat Plaintiff's symptoms; (g) failing to properly provide follow-up care; and (h) failing to properly prescribe medications for Plaintiff's symptoms, among other things."

Drs. Vander Wall and Linares answered separately, generally denying the allegations and asserting several affirmative defenses. The Regents then answered on behalf of the erroneously-sued Santa Monica UCLA Medical Center and Orthopaedic Hospital, and the remaining doctors answered separately; all denied the allegations and

6

asserted affirmative defenses. Thereafter, appellant and the Regents stipulated to dismiss all individual doctor defendants with prejudice, together with the stipulation that the doctors were employees of the Regents and acting within the course and scope of their employment at all relevant times.

In January 2011, the Regents served appellant with an offer to compromise pursuant to Code of Civil Procedure section 998 (section 998 offer), providing "[t]hat defendant will, in exchange for a dismissal with prejudice of REGENTS OF THE UNIVERSITY OF CALIFORNIA, waive any claim for costs and . . . waive any right to proceed with any action for malicious prosecution." Appellant did not accept the offer. The parties designated their expert witnesses for trial during March and April 2011.

### *Trial.*

A jury trial commenced in July 2011. David Payne, M.D., a Board-certified orthopedic surgeon, testified as an expert on appellant's behalf. He testified that appellant's May 18, 2009 X-ray showed "a subluxation of her navicular," or a bone that was not in its correct anatomical location. For this reason, Dr. Payne opined that as of May 18, 2009, appellant was in the acute phase of the disease, transitioning from the zero or prodromal phase into the fragmentation phase. On the basis of appellant's May 24, 2009 X-ray, he opined that appellant's navicular had become completely dislocated. In order to avoid that result, the appropriate treatment would have been to put her in a total-contact cast.

Though Charcot foot and cellulitis present with similar symptoms, Dr. Payne noted that the redness caused by Charcot foot will dissipate if the foot is elevated, while the same is not true for cellulitis. He noted that diabetes and neuropathy also indicate a predisposition for Charcot foot. He opined that appellant's condition must have developed in less than one year on the basis of an MRI of appellant's foot, but he retracted that statement once he realized the MRI was of her right foot.

Dr. Payne advised it is important to treat a person with Charcot foot early in the "zero or prodromal phase of the disease" by stabilizing the foot in a cast. In his deposition, however, Dr. Payne testified that he did not believe anyone in the world had

ever seen a patient with impending Charcot deformity before any bones had dislocated. He testified that "[i]f the foot gets into the fragmentation phase, the cascade had already started, and it goes through resorption and reconstruction, coalescence and reconstruction. That is going to happen no matter what because that is the disease process." As applied to appellant, by the time the first evidence of redness presented on her foot, she already had micro-fractures of her bones. Nonetheless, he opined that casting appellant's foot during the acute phase would have helped alleviate further transmutation of the bones.

He opined that Dr. Leibowitz violated the standard of care by diagnosing cellulitis given appellant had recently been on antibiotics and in view of her blood levels, and by failing to recommended treatment to address Charcot foot; Dr. Linares fell below the standard of care by failing to recommend immobilization and/or a cast; Dr. Motamedi violated the standard of care by missing the subluxation of appellant's navicular in the May 18, 2009 X-ray; Dr. Hajomenian violated the standard of care by failing to consider a diagnosis of Charcot foot; Drs. Vander Wall and Young violated the standard of care by failing to consider a diagnosis of and recommended treatment for Charcot foot, given their acknowledgement of a bony prominence on appellant's foot; and other doctors violated the standard of care by failing to treat appellant for Charcot foot after observing symptoms inconsistent with cellulitis.

Dr. Payne also described the problems and potential problems arising from appellant's Charcot foot, and discussed the type of medical care and treatment appellant may require in the future.

Deborah Forrester, M.D., testified as an expert for the Regents. She was a musculoskeletal radiologist, board certified in diagnostic and therapeutic radiology, and was an associate professor at the University of Southern California Medical School. She had diagnosed Charcot arthropathy many times. Similar to Dr. Mejia, she outlined the two factors that contribute to Charcot athropathy: First, because of the loss of feeling, repetitive and minor trauma breaks down the bones, and second, the nerve loss also affects the vascular supply and results in an increased blood flow to the joints. She had

8

never before diagnosed Charcot foot before bone disintegration or fracture because, by definition, Charcot foot demonstrates such fragmentation.

In response to a hypothetical question that mirrored appellant's condition when she was admitted to the hospital on May 18, 2009, Dr. Forrester opined that casting the patient's foot would not have prevented the progression of the Charcot arthropathy that was apparent on the May 24, 2009 X-ray. She reached the same conclusion given the additional fact that a May 18, 2009 X-ray showed subtle changes indicating the destructive process had already begun. On the basis of the May 18, 2009 X-ray, she further opined that the progression of the Charcot foot had already begun, as the X-ray showed a subtle misalignment of the tarsal bones. In her opinion, once the progression of fragmentation and disorganization has begun, nothing—including casting—will stop it. She was not critical of Dr. Motamedi's initial evaluation of the X-ray, however, given that the benefit of hindsight enabled her to be more sensitive in her own evaluation. She opined that Dr. Motamedi's interpretation of appellant's X-ray was within the standard of care given the subtlety of the bone dislocation.

Following approximately two days of deliberations, the jury returned a special verdict finding that Drs. Vander Wall and Young were negligent in their diagnosis or treatment of appellant; Drs. Lebowitz, Linhares, Hajomenian, Scholle, Bhattacharya and Motamedi were not negligent; and the negligence of any Regents' employee was not a substantial factor in causing harm to appellant. Though the jurors were not unanimous in their negligence determinations, the jury's causation verdict was unanimous. The trial court entered judgment on the special verdict in August 2011.

### *Posttrial Motions.*

#### **Motions for judgment notwithstanding the verdict and a new trial.**

Following entry of judgment, appellant filed motions for judgment notwithstanding the verdict and a new trial. The only ground raised in the motion for a new trial was insufficiency of evidence. The Regents opposed both motions.

9

In October 2011, the trial court heard and denied both motions. It concluded that either viewed through the eyes of the jury or independently, the evidence supported the verdict.

**Motion to tax costs.**

The Regents filed a cost memorandum seeking costs in the amount of $27,614.34, which included $17,583 for expert witness fees. Appellant filed a motion to tax costs, challenging three discrete categories of claimed costs. The Regents opposed the motion.

In November 2011, the trial court adopted its tentative ruling granting in part and denying in part the motion to tax costs. The trial court declined to permit a new attorney to argue on appellant's behalf because no written substitution of counsel had been filed and declined to permit appellant to make a statement regarding her ability to pay.

After a substitution of counsel was filed, appellant filed a motion for reconsideration of the motion to tax costs. Though the motion indicated it was based on the ground that counsel had been precluded from arguing, the memorandum of points and authorities and attached declarations advanced several new arguments, including that all expert witness fees and costs should be denied because the section 998 offer was invalid; appellant was never made aware of the section 998 offer; and appellant lacked the ability pay. Before the motion was heard, appellant also filed a motion for renewal of her motion to tax costs which incorporated the new arguments asserted in her motion for reconsideration. She filed and served the motion on January 24, 2012, with a February 14, 2012 hearing date. The Regents filed its opposition to both motions on February 1, 2012.

At a February 14, 2012 hearing, the trial court denied both motions. In connection with the motion for reconsideration, the trial court ruled that appellant failed to present any basis warranting reconsideration of its prior order. With respect to the renewed motion to tax costs, the trial court ruled: "The Motion requires 16 days notice with personal service. The Motion was served 14 days prior to the hearing date. Additionally, Plaintiff fails to establish that there are new facts or circumstances to justify the Motion."

10

*Appeal.*

Appellant filed her initial notice of appeal in November 2011 and a subsequent notice of appeal in March 2012. We consolidated both appeals.

## DISCUSSION

Appellant challenges both the judgment and the trial court's post-judgment rulings. We address each claim in turn, finding no merit to any contention.

## I. Substantial Evidence Supported the Jury Verdict.

### A. *Standard of Review.*

"When a party contends insufficient evidence supports a jury verdict, we apply the substantial evidence standard of review. [Citations.]" (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.) Under this standard, "[a]ll conflicts in the evidence are resolved in favor of the prevailing party, and all reasonable inferences are drawn in a manner that upholds the verdict." (*Holmes v. Lerner* (1999) 74 Cal.App.4th 442, 445.) "[W]e do not evaluate the credibility of the witnesses or otherwise reweigh the evidence. [Citation.] Rather, 'we defer to the trier of fact on issues of credibility. [Citation.]' [Citation.]" (*Escamilla v. Department of Corrections & Rehabilitation* (2006) 141 Cal.App.4th 498, 514–515.) "In short, even if the judgment of the trial court is against the weight of the evidence, we are bound to uphold it so long as the record is free from prejudicial error and the judgment is supported by evidence which is 'substantial,' that is, of '"ponderable legal significance"' '"reasonable in nature, credible, and of solid value . . . ."' [Citations.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.) In other words, "'[i]f there is substantial evidence in favor of the respondent, *no matter how slight it may appear* in response with the contradictory evidence, the judgment will be affirmed.'" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 872.) The testimony of one witness may constitute substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)

### B. *Appellant Forfeited Her Substantial Evidence Challenge.*

Appellant contends substantial evidence did not support the jury's unanimous no-causation finding. An appellant who challenges a finding on the basis of insufficient

11

evidence is required to set forth in the opening brief all the material evidence on that issue or finding and not merely evidence favorable to his or her position. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *Clark v. Superior Court* (2011) 196 Cal.App.4th 37, 53.) An appellant must state fully, with citations to the record, the evidence claimed to be insufficient to support the trial court's findings. (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887; *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.) As further explained in *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218, "[a] party who challenges the sufficiency of the evidence to support a finding must set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable." (Accord, *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409–410 ["An appellate court will consider the sufficiency of the evidence to support a given finding only after a party tenders such an issue together with a fair summary of the evidence bearing on the challenged finding, particularly including evidence that arguably *supports* it"]; *Boeken v. Phillip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658 [appellate court "presume[s] that the record contains evidence to sustain every finding of fact" and "[i]t is the appellant's burden to demonstrate that it does not"].)

If an appellant fails to fairly present all evidence bearing on the challenged finding, the reviewing court may deem the substantial evidence contention waived. (*Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at p. 881; *Huong Que, Inc. v. Luu, supra,* 150 Cal.App.4th at p. 410; *Nwosa v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Here, appellant's substantial evidence challenge in her opening brief relies exclusively on the favorable testimony of Dr. Payne and omits to mention Dr. Forrester's testimony or any other conflicting evidence offered or elicited by the Regents. Appellant's inadequate and one-sided presentation of the evidence warrants the conclusion that she has forfeited any claim concerning the sufficiency of the evidence.

### C. *Substantial Evidence Supported the No-Causation Finding.*

In any event, even if we were to consider appellant's substantial evidence challenge, we would reject it on the merits. She contends there was insufficient evidence

to support the conclusion that the Regents' negligence, as found by the jury, was not the proximate cause of her injuries.

"'The elements of a cause of action in tort for professional negligence are: (1) the duty of the professional to use such skill, prudence and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence. [Citations.]' [Citation.]" (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1077; accord, *Galvez v. Frields* (2001) 88 Cal.App.4th 1410, 1420.) "In a medical malpractice action, a plaintiff must prove the defendant's negligence was a cause-in-fact of injury. [Citation.] 'The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based [on] competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case. [Citations.]" (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1118.)

Here, Dr. Payne testified that every doctor who dealt with appellant acted below the standard of care by failing to diagnose her Charcot foot, and opined that casting appellant's foot earlier would have helped minimize further transmutation of the bones. On the other hand, Dr. Forrester and even Dr. Payne testified that once appellant's Charcot arthropathy entered the fragmentation phase, nothing could have stopped the disease progression. Dr. Forrester testified that by May 18, 2009, the progression of fragmentation and disorganization had already begun on appellant's left foot, and casting would not have done anything to stop the progression. Dr. Payne conceded that "[i]f the foot gets into the fragmentation phase, the cascade had already started, and it goes through resorption and reconstruction, coalescence and reconstruction. That is going to happen no matter what because that is the disease process." He further opined that the cascade had begun once appellant's foot began to swell and exhibit redness.

Notably, the jury found that none of the doctors who were involved in appellant's preliminary diagnosis and initial treatment acted below the standard of care. This finding was consistent with expert testimony that a diagnosis of Charcot foot typically does not

13

occur before bone disorganization or fracture. The jury found only Drs. Vander Wall and Young acted below the standard of care. They treated appellant on May 23, 2009, when a bony prominence had manifested itself on appellant's foot, yet did nothing further to determine its origin until the next day. Substantial evidence supported the jury's determination that Drs. Vander Wall and Young acted below the standard of care in failing to diagnose Charcot foot, but that their conduct was not the cause of appellant's injury because, by the time of manifestation, fractures and dislocations were an inevitable consequence of appellant's condition.

The cases on which appellant relies in support of her substantial evidence argument are neither factually nor procedurally similar and therefore do not assist her. (See *Keen v. Prisinzano* (1972) 23 Cal.App.3d 275, 281 [order granting defendant doctors' motion for nonsuit reversed where jury could have reasonably concluded from the evidence that negligent misdiagnosis led to a treatment creating more of a residual disability than treatment for properly diagnosed condition]; *Burford v. Baker* (1942) 53 Cal.App.2d 301, 307–308 [in view of expert testimony that misdiagnosing and failing to timely treat the plaintiff's condition exacerbated his injuries, substantial evidence supported the jury's proximate cause finding]; *James v. United States* (N.D. Cal. 1980) 483 F.Supp. 581, 587 [trial court finding that the plaintiffs sustained their burden of showing that the patient would have benefitted from early treatment and was deprived of that treatment as a proximate result of the defendant's negligence].) None of appellant's cases involve an appellate court reversing a jury verdict that was supported by expert testimony on causation.

Nor is there any support in the record for appellant's argument that the jury must have speculated as to a supervening cause in reaching its no-causation finding. The jury was not instructed on the concept of intervening or superseding causes. Rather, it received standard instructions providing that appellant had the burden of proving the Regents' negligence was a substantial factor in causing her harm, and that "[a] substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have

14

to be the only cause of the harm. [¶] Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." Absent some evidence to the contrary, we presume the jury followed its instructions. (E.g., *Cassim v. Allstate Ins. Co.*(2004) 33 Cal.4th 780, 803–804; *Saari v. Jongordon Corp.* (1992) 5 Cal.App.4th 797, 807, fn. 6.) Accordingly, we presume the jury followed its causation instructions and reached its verdict on the basis that the Regents' conduct was not a substantial factor in causing her injury.

## II. The Trial Court Properly Denied Appellant's Post-Judgment Motions Challenging the Verdict.

### A. *Motion for Judgment Notwithstanding the Verdict.*

A judgment notwithstanding the verdict is proper only if there is no substantial evidence to support the verdict and the evidence compels a judgment in favor of the moving party as a matter of law. (Code Civ. Proc., § 629; *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) In ruling on the motion, the trial court is obligated to view the evidence in the light most favorable to the verdict. (*Sweatman v. Department of Veterans Affairs, supra,* at p. 68.) "On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citations.] If there is, we must affirm the denial of the motion." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.)

In arguing that the motion for judgment notwithstanding the verdict should have been granted, appellant for the first time acknowledges the testimony of Dr. Forrester. Yet her contention is not that Dr. Forrester's testimony was insufficient to support the verdict, but rather, that it was outweighed by competing testimony from Dr. Payne and testimony from Dr. Mejia that he recommended stabilizing appellant's foot to prevent further collapse. Essentially, she quotes her closing argument and asserts that the motion should have been granted because the evidence should have been viewed as outlined in her argument.

15

On a motion for judgment notwithstanding the verdict, the trial court's role is not to reinterpret the evidence. "The court must accept as true the evidence supporting the jury's verdict, disregarding all conflicting evidence and indulging in every legitimate inference that may be drawn in support of the judgment. The court may grant the motion only if there is no substantial evidence to support the verdict. [Citations.]" (*Tognazzini v. San Luis Coastal Unified School Dist.* (2001) 86 Cal.App.4th 1053, 1058.) If the evidence is conflicting or susceptible of more than one reasonable inference, the motion for judgment notwithstanding the verdict should be denied. (*Bengal v. Canfield & Associates, Inc.* (2000) 78 Cal.App.4th 66, 72.)

The trial court here properly denied appellant's motion for judgment notwithstanding the verdict because substantial evidence supported the jury verdict. On the basis of Dr. Forrester's testimony, the jury could have reasonably concluded that any negligence was not a substantial factor in causing appellant injury, as by May 18, 2009, the destructive process of Charcot foot had already begun, and the disorganization and fracture of the bones in appellant's foot would have inevitably occurred regardless of the Regents' conduct.

### B. Motion for a New Trial.

In evaluating whether a new trial should be granted for insufficient evidence, the trial court may "review conflicting evidence, weigh its sufficiency, consider credibility of witnesses and draw reasonable inferences from the evidence presented at trial." (*Valdez v. J.D. Diffenbaugh Co.* (1975) 51 Cal.App.3d 494, 512; accord, *Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412; Code Civ. Proc., § 657, subd. 6.) But on appeal, we review an order denying a motion for a new trial for an abuse of discretion. "'A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. "'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.'" [Citation.]' [Citation.]" (*Garcia v. Rehrig Internat., Inc.* (2002) 99 Cal.App.4th 869, 874.) The court in *Lane v. Hughes Aircraft Co., supra,* 22 Cal.4th at page 412 explained

16

that such deference is accorded because "[t]he trial court sits much closer to the evidence than an appellate court. Even the most comprehensive study of a trial court record cannot replace the immediacy of being present at the trial, watching and hearing as the evidence unfolds. The trial court, therefore, is in the best position to assess the reliability of a jury's verdict and, to this end, the Legislature has granted trial courts broad discretion to order new trials."

Appellant's chief contention is that the trial court failed to conduct an independent evaluation of the evidence. The record belies her claim. After characterizing Dr. Forrester as "very compelling in terms of what she had to say about this Charcot foot condition and with 40 years experience as a radiologist," the trial court listened to appellant's argument as to why it should view Dr. Payne's testimony as more compelling. The trial court acknowledged the two experts offered different theories—Dr. Payne opined that casting appellant's foot could have alleviated some of the damage, while Dr. Forrester opined that once the Charcot foot dislocation process begins, the foot will settle no matter what external efforts are undertaken. It further reasoned that the jury did not give Dr. Payne's testimony much credit; instead it "found that even if these doctors may have missed something on Friday when they saw that protrusion, that bony prominence, there still was nothing they could do; so they are not the proximate cause of her injury."

Responding to appellant's plea that it independently evaluate the evidence to determine whether it supported the verdict, the trial court continued: "I think the jury's verdict is supported by the evidence, and I think Dr. Payne came in a little brash, and he's making a lot of statements, and then he misidentified an X-ray from one foot to the other, and he lost a lot of credibility, and there was nothing to support the things that he said in terms of if you cast it right away and you can prevent the problem. We got Dr. Forrester who came in here, very direct. She said once the process starts, you can't stop it; it has to find its point of rest. And I think the jury relied on that. She was very believable, 40-plus years of experience. I just—I don't see anything—I don't see any reason why I would grant a motion for new trial." Given the trial court's express agreement with the

17

jury's implicit determination that Dr. Forrester was more credible than Dr. Payne, we find no abuse of discretion.

**III.     The Trial Court Properly Denied Appellant's Multiple Efforts to Tax Costs.**

The trial court granted in part and denied in part appellant's initial motion to tax costs, and thereafter denied appellant's motion for reconsideration and renewed motion to tax costs. Notwithstanding appellant's contention at oral argument that we must review the multiple denials of her efforts to tax costs for substantial evidence, we review the denial of a motion to tax costs for abuse of discretion. (*Chaaban v. Wet Seal, Inc.* (2012) 203 Cal.App.4th 49, 52.) To the extent appellant's motion to tax costs was directed toward costs awarded pursuant to the section 998 offer, we again review the trial court's ruling for an abuse of discretion. (*Bates v. Presbyterian Intercommunity Hospital, Inc.* (2012) 204 Cal.App.4th 210, 221.) We likewise review the denial of a motion for reconsideration for an abuse of discretion. (*California Correctional Peace Officers Assn. v. Virga* (2010) 181 Cal.App.4th 30, 42; *New York Times Co. v. Superior Court* (2005) 135 Cal.App.4th 206, 212.)

In her initial motion to tax costs, appellant argued that she should not be liable for deposition costs for Dr. Kious, witness fees for three witnesses who did not testify at trial and transcript fees for opening statement and Dr. Payne's testimony. She sought a total reduction of $15,813.75. In accordance with the Regents' concession that certain amounts were not properly recoverable as costs, the trial court granted the motion in part, reducing the cost bill by $1,879 for witness fees and by $722 for transcripts. In all other respects it denied the motion.

Appellant does not address the substance of the trial court's ruling on the initial motion, but rather, challenges only the trial court's refusal to allow her new counsel to appear and argue on her behalf absent a written substitution of attorney. We find no abuse of discretion. Code of Civil Procedure sections 284 and 285 set forth the statutory

18

requirements for substituting attorneys.[1] Describing the import of these provisions, the court in *People ex rel. Dept. Pub. Wks. v. Hook* (1967) 248 Cal.App.2d 618, 623, summarized: """"It is well settled that a client has a right to discharge his attorney at any time . . . ." [¶] "While the client has an absolute right as above set forth to discharge his attorney at any stage of the proceeding, the substitution of an attorney of record can only be made in the manner provided in section 284, Code of Civil Procedure [citation]." [¶] "'It is settled that the attorney of record has the exclusive right to appear in court for his client and to control the court proceedings, so that neither the party himself (citing cases), nor another attorney (citing cases) can be recognized by the court in the conduct or disposition of the case.' [Citation.]"""" (Accord, *Epley v. Califro* (1958) 49 Cal.2d 849, 854 [until a written substitution of attorney is filed, "the attorney of record must be recognized as [the client's] exclusive representative"].)

Nor do we find that the trial court abused its discretion in connection with any other aspect of the ruling. In view of appellant's failure to properly secure new counsel, the trial court acted within its discretion in declining to hold a hearing on the motion. "The decision to listen to oral argument on a motion is within the discretion of the court, and the court may decide a motion solely on the basis of the supporting affidavits. [Citations.]" (*Wilburn v. Oakland Hospital* (1989) 213 Cal.App.3d 1107, 1111; see also Cal. Rules of Court, rule 3.1700(b) [no hearing requirement for motion to tax costs].) Similarly, the trial court acted within its discretion by refusing to continue the hearing to enable appellant to file a substitution of counsel, given that she offered no reason why she did not file her substitution before the hearing date. (See *Midwest Television, Inc. v.*

---

[1]    Code of Civil Procedure section 284 provides that "[t]he attorney in an action or special proceeding may be changed at any time before or after judgment or final determination, as follows:  [¶]  1. Upon the consent of both client and attorney, filed with the clerk, or entered upon the minutes;  [¶]  2. Upon the order of the court, upon the application of either client or attorney, after notice from one to the other," and section 285 provides that "[w]hen an attorney is changed, as provided in the last section, written notice of the change and of the substitution of a new attorney, or of the appearance of the party in person, must be given to the adverse party.  Until then he must recognize the former attorney."

*Scott, Lancaster, Mills & Atha, Inc.* (1988) 205 Cal.App.3d 442, 456 [proper exercise of discretion to deny continuance of trial where trial court impliedly found lack of diligence by the moving party].)  Finally, the trial court did not abuse its discretion by refusing to continue the hearing so that appellant could address the court directly regarding her ability to pay.  (See *In re Marriage of Lemen* (1980) 113 Cal.App.3d 769, 785 ["The court in a civil case was not required to hear directly from one represented by counsel"].)  In any event, the trial court admitted into evidence at trial appellant's wage and tax statements for the years 2006 through 2009, and therefore had already received evidence relevant to her ability to pay.

In her motion for reconsideration, appellant raised several new arguments, including that the Regents should be barred from recovering any expert witness fees and related costs because the section 998 offer was not made in good faith and was unreasonable; appellant was never made aware of the offer; and she lacked the ability to pay.  Code of Civil Procedure section 1008 authorizes a party who is affected by an order to file within 10 days after service of written notice of entry of the order an application for reconsideration based upon new or different circumstances, facts or law.  The phrase "'new or different circumstances'" should not be construed to mean "that all facts not previously presented to a court now suffice; nor does it mean the Legislature has dispensed with the court-declared need to show a satisfactory explanation for failing to provide the evidence earlier, which can only be described as a strict requirement of diligence.  [Citation.]"  (*Garcia v. Hejmadi* (1997) 58 Cal.App.4th 674, 690; see also *Forrest v. Department of Corporations* (2007) 150 Cal.App.4th 183, 202 [a motion for reconsideration requires a strong showing of diligence], disapproved on another point in *Shalant v. Girardi* (2011) 51 Cal.4th 1164, 1172, fn. 3; *Mink v. Superior Court* (1992) 2 Cal.App.4th 1338, 1342 [the party seeking reconsideration must offer a satisfactory explanation for the failure to produce the new or different facts at an earlier time].)

Here, the declarations from appellant's counsel addressed only the inability to argue the new points at the hearing; neither declaration explained why the new arguments had not been made in the original motion.  The attacks on the section 998 offer were

20

based on facts and conduct that occurred at the time of the offer and did not involve any new law. Belatedly asserting a new theory on the basis of facts that existed at the time of the initial motion does not warrant reconsideration. (See *Baldwin v. Home Savings of America* (1997) 59 Cal.App.4th 1192, 1199 ["Without a diligence requirement the number of times a court could be required to reconsider its prior orders would be limited only by the ability of counsel to belatedly conjure a legal theory different from those previously rejected, which is not much of a limitation"].) Accordingly, the trial court was well within its discretion to deny the motion for reconsideration.

Finally, appellant personally served her motion for renewal of her motion to tax costs on January 24, 2012. The motion was set for hearing on February 14, 2012. The motion was untimely according to Code of Civil section 1005, subdivision (b), which requires that "all moving and supporting papers shall be served and filed at least 16 court days before the hearing." Thus, the trial court was well within its discretion to deny the motion on that basis alone.

The trial court further ruled, however, that appellant had offered no new facts or circumstances justifying a renewal of the motion. Indeed, appellant's arguments in her motion for renewal of her motion to tax costs mirrored those raised in her motion for reconsideration. She asserted that the section 998 offer to waive costs and the filing of a malicious prosecution action in exchange for appellant's dismissal was unreasonable and not in good faith.

"A prevailing party who has made a valid pretrial offer pursuant to Code of Civil Procedure section 998 is eligible for specified costs, so long as the offer was reasonable and made in good faith. [Citation.]" (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 134.) "Good faith requires that the pretrial offer of settlement be 'realistically reasonable under the circumstances of the particular case. Normally, therefore, a token or nominal offer will not satisfy this good faith requirement, . . .' [Citation.] The offer 'must carry with it some reasonable prospect of acceptance. [Citation.]' [Citation.] One having no expectation that his or her offer will be accepted will not be allowed to benefit from a no-risk offer made for the sole purpose of later recovering large expert witness fees." (*Jones*

21

*v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1262–1263.) But a modest or token offer may be reasonable if an action lacks merit. (*Hartline v. Kaiser Foundation Hospitals* (2005) 132 Cal.App.4th 458, 471; *Nelson v. Anderson, supra,* at p. 134; see also *Culbertson v. R. D. Werner Co., Inc.* (1987) 190 Cal.App.3d 704, 710 ["When a defendant perceives himself to be fault free and has concluded that he has a very significant likelihood of prevailing at trial, it is consistent with the legislative purpose of section 998 for the defendant to make a modest settlement offer"].) "There is no per se violation of the good faith requirement just because the offer does not tender a net monetary sum. [Citation.] In a particular case, a waiver of costs may be an offer of significant value." (*Hartline v. Kaiser Foundation Hospitals, supra,* at p. 471.) A defense verdict is prima facie evidence that the section 998 offer was reasonable. (*Jones v. Dumrichob, supra,* at p. 1264.)

Notwithstanding the untimeliness of the motion to renew, the trial court entertained argument on the merits of the motion. In view of the unanimous jury verdict on causation, the trial court was within its discretion to deny the motion on the merits, as appellant failed to meet her burden to show the section 998 offer was unreasonable and not made in good faith. (See *Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 136–137, 154 [in action for breach of contract, fraud and antitrust violations, trial court could have reasonably concluded the oil company defendant's offer of $100 and cost waiver to multiple gasoline dealer plaintiffs to be in good faith, given that costs and fees were considerable]; *Jones v. Dumrichob, supra,* 63 Cal.App.4th at pp. 1263–1264 [the defendant's offer to allow judgment to be entered against him for a waiver of costs was sufficient to support an award of expert witness fees under section 998, as the offer carried significant value].)

## DISPOSITION

The judgment and all post-judgment orders are affirmed. The Regents is entitled to its costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J. *

　　　　　　　　　　　FERNS

We concur:


_____, Acting P. J.

　　　ASHMANN-GERST


_____, J.

　　　CHAVEZ

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.